[Cite as *State v. Carter*, 2011-Ohio-6700.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee                 :          C.A. CASE NO. 2011 CA 11

v.                                     :          T.C. NO.    2010CR358

DORIAN CARTER                          :          (Criminal appeal from
                                                  Common Pleas Court)
    Defendant-Appellant                :

                                       :

. . . . . . . . . .

# O P I N I O N

Rendered on the ___23rd___ day of ___December___, 2011.

. . . . . . . . . .

ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecutor, 61 Greene Street, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

ANTHONY COMUNALE, Atty. Reg. No. 0062449, 130 West Second Street, Suite 2050, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1}  Dorian Carter appeals from a judgment of the Greene County Court of Common Pleas, which, after overruling his motions to suppress evidence, found him guilty on his no contest pleas to three counts of complicity to aggravated trafficking in drugs.  The court sentenced him to a mandatory term of four years on each count, to

be served concurrently.

{¶ 2} Carter's indictment followed a series of controlled purchases of ecstasy by a confidential informant in conjunction with the Greene County A.C.E. Task Force. These purchases, which occurred between August and December 2009, led the police to seek a search warrant for Carter's apartment, 1777 Arlin Place, Apartment H, in Fairborn. The affidavit in support of the search warrant was prepared by Detective Richard Miller of the Yellow Springs Police Department; it detailed three controlled purchases of ecstasy made by the confidential informant and the evidence linking the ecstasy to apartment H. According to Detective Miller, no information was presented to the judge beyond that contained in the affidavit.

{¶ 3} On December 10, 2009, a judge issued a search warrant for 1777 Arlin Place, Apartment H. The search warrant was executed on December 11, 2009. Carter made statements to the police at the time of the search, and drugs and weapons were found in his apartment.

{¶ 4} In July 2010, Carter was indicted on two counts of conspiracy to commit aggravated trafficking in drugs (ecstasy), three counts of complicity to aggravated trafficking in drugs (ecstasy), one count of possession of marijuana, and one count of trafficking in marijuana, with a firearm specification. The indictment also contained forfeiture specifications with respect to numerous guns, cash, and a flat-screen television. Carter pled not guilty and filed motions to suppress his statements to the police and the evidence found as a result of the search of his apartment. In October 2010, the trial court held a hearing on the motions to suppress. The trial court overruled the motions to suppress in their entirety.

{¶ 5}   After the trial court overruled his motions to suppress, Carter changed his plea to no contest on three counts of complicity to aggravated trafficking in drugs, all felonies of the third degree with mandatory imprisonment; the other counts, including the firearm specification, were dismissed.   The trial court found Carter guilty and sentenced him to a definite term of four years on each count, to be served concurrently, as discussed above.   Carter also stipulated to the forfeiture of all the items listed in the indictment, and the trial court ordered such forfeiture.

{¶ 6}   Carter raises two assignments of error on appeal, which relate to the denial of his motions to suppress evidence.

{¶ 7}   The first assignment of error states:

{¶ 8}   "TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE SEARCH WARRANT."

{¶ 9}   Carter contends that the affidavit in support of the search warrant contained insufficient evidence to justify the issuance of the warrant and that, accordingly, the evidence obtained in the search should have been suppressed.

{¶ 10}  "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *State v. George* (1989), 45 Ohio St.3d 325,  paragraph one of the syllabus, following *Illinois v. Gates* (1983), 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527.   "[N]either a trial court nor an appellate court

should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." Id., at paragraph two of the syllabus. The nexus between the items sought and the place to be searched depends upon all of the circumstances of each individual case, including the type of crime and the nature of the evidence. *State v. Freeman*, Highland App. No. 06CA3, 2006-Ohio-5020.

{¶ 11} A search warrant enjoys a presumption of validity; when a defendant's motion to suppress attacks the validity of a search conducted under a warrant, the defendant bears the burden of proof. *State v. Barnes* (Mar. 16, 2000), Franklin App. No. 99AP-572.

{¶ 12} Detective Miller's affidavit in support of the search warrant stated:

{¶ 13} "2. On or about August 25, 2009, the Affiant was contacted by a confidential source, hereafter referred to as CS#1, who told the Affiant that he/she knew a subject by the name of David Rose who lived at Arlin Apartments and sold ecstasy. CS#1 told the Affiant that Rose used telephone number 937-626-2535 to facilitate his drug transactions.

{¶ 14} "3. On or about August 25, 2009, the Affiant directed CS#1 to place a

controlled telephone call to Rose to order a quantity of ecstasy. The Affiant made a recording of the telephone call. CS#1 ordered a quantity of ecstasy from Rose and was quoted a price for the ecstasy. On the phone, Rose identified his supplier as a subject named 'D', telling CS#1 that D was his neighbor at the Arlin Apartments. Rose told CS#1 that he was going to call D and get the ecstasy to sell to CS#1. Rose called CS#1 moments late[r] and stated that he (Rose) had gotten the ecstasy from D and was ready to meet. *** Detectives Kordish and Prall, and other law enforcement officials, conducted audio and video surveillance of CS#1 at the deal location. Shortly after CS#1 arrival at the deal location, Rose arrived as a passenger of a VW Jetta bearing Ohio license number EUL8813. Rose got into the passenger seat of CS#1 vehicle and exchanged the buy money for a quantity of purported ecstacy. After the exchange, Rose exited CS#1 and returned to the vehicle he arrived in. Surveillance detectives followed Rose and the vehicle he arrived in back to the Arlin Apartments. CS#1 left the deal location and returned to meet with the Affiant and Detective Julian. ***

{¶ 15} "4. The Affiant conducted a check through the Ohio Law Enforcement Gateway (OHLEG) Database on the name David Rose. OHLEG showed that a subject by the name of David Rose listed his address as 1777 Arlin Pl Apt. A, Fairborn, Ohio, 45324. The Affiant knows that Apartment A is in close proximity to Apartment H confirming what Rose had told CS#1 about D being his neighbor. The Affiant was able to positively identify Rose via his BMV photo as the person that met with CS#1 and sold CS#1 ecstasy.

{¶ 16} "5. On or about October 14, 2009, the Affiant directed CS#1 to place a controlled telephone call to Rose to order another quantity of ecstasy. *** CS#1 ordered a quantity of ecstasy from Rose and was quoted a price for the ecstasy. On

the phone Rose tells CS#1 that he was going to walk over to D's apartment and check to see if he had any ecstasy. Rose called back moments later and told CS#1 that D fronted him a quantity of ecstasy and that he was ready to meet with CS#1 to complete the deal. *** The Affiant and other law enforcement officials monitored CS#1 as he traveled the area of the 1700 Block of Arlin Pl, to meet Rose. Detectives Hern and Etchison, ACE Task Force, conducted audio and video surveillance of CS#1 at the deal location. Shortly after CS#1 arrival at the deal location, Rose approached CS#1 vehicle on foot and met CS#1 at the driver window. CS#1 exchanged the buy money for a quantity of purported ecstasy. After the exchange Rose left the deal location on foot. After the deal, Rose told CS#1 that he needed to go pay D back for the ecstasy CS#1 had purchased from him. CS#1 observed Rose go into 1777 Arlin Pl., Apt H, to repay D. ***

{¶ 17} "6. On or about December 9, 2009, the Affiant directed CS#1 to place a controlled telephone call to Rose to order another quantity of ecstasy. *** CS#1 ordered a quantity of ecstasy. Rose tells CS#1 that he would call D and call him back. Rose called moments later saying th[at] D had the ecstasy but stated he would need a ride to D's apartment to pick up the ecstasy. Detective Hern and the Affiant met with CS#1 to complete the deal with Rose and D. *** Detective Tidd conducted audio and video surveillance in the parking lot of 1777 Arlin Pl and observed CS#1 vehicle park in the lot. Detective Tidd observed Rose exit the passenger side of the vehicle and enter 1777 Arlin Pl Apt. H, as CS#1 waited in the vehicle. Within a couple of minutes Rose exited apartment H and got back into CS#1 vehicle. Inside, Rose gave CS#1 a quantity of purported ecstasy. Rose also showed CS#1 additional purported ecstasy

stating he bought additional ecstasy to sell to another person. Rose claimed that D had hundreds more ecstasy for sale. The Affiant and other Law Enforcement officials followed CS#1 and Rose back [to] Rose's address. After dropping off Rose the Affiant and Detective Hern met with CS#1 and retrieved the purchased ecstasy. ***

{¶ 18} "7. On December 10, 2009, the Affiant obtained a Grand Jury subpoena and served it upon Dayton Power and Light for subscriber of electricity for 1777 Arlin Pl Apt H, Fairborn, Ohio 45324. Information returned by Dayton Power and Light showed that Dorian Carter, SSN [omitted], DOB [omitted], has the electricity in his name for 1777 Arlin Pl Apt H, Fairborn, Ohio 45324."

{¶ 19} The affidavit further stated that the detectives had provided the money used to complete the transactions and had thoroughly searched the confidential informant (and, when necessary, his car) both before and after each transaction; they also monitored his travel to and from the meeting place and his telephone calls with Rose. The substance purchased in the first two transactions was sent to the Miami Valley Regional Crime Lab and was confirmed to be ecstasy; the substance purchased in the third transaction "received a positive indicator" for ecstasy in a field test. Finally, the affidavit listed numerous "common practices" of drug dealers, based on Detective Miller's experience, many of which were consistent with the actions of "D" and Rose in this case.

{¶ 20} Although Carter correctly notes in his brief that much of the affidavit in support of the warrant to search his apartment focuses on the behavior of Carter's neighbor, Rose, who was the middle-man in the drug sales, information about Carter's role is also included. For example, in a conversation with the confidential informant,

Rose identified "D" as his supplier and as a neighbor. Rose also recounted to the confidential informant having "walked over" to his supplier, being "fronted" a quantity of ecstasy, and seeing a very large quantity of ecstasy in "D"'s possession. It is apparent from the time frames described in the affidavit that Rose was able to acquire ecstasy very quickly when he was at his apartment, and that he returned to his apartment building to acquire ecstasy when he was elsewhere. Additionally, according to the affidavit, on one occasion the confidential informant saw Rose return directly from one of their transactions on the street to apartment H, Carter's apartment. The affidavit also mentions audio and video surveillance by one of the detectives, suggesting that the detective saw Rose enter apartment H while the confidential informant waited outside to complete one of their transactions.

{¶ 21} The magistrate issuing the search warrant was not required to conclude that apartment H was the only possible source of the ecstasy provided through the transactions with Rose. The magistrate need only have concluded that there was a fair probability that contraband or evidence of a crime would be found in apartment H. In our view, the affidavit provided a reasonable basis to conclude that apartment H likely contained evidence related to the drug transactions that had been set up and monitored by the A.C.E Task Force. The trial court did not err in refusing to suppress the evidence obtained in the search of apartment H.

{¶ 22} The first assignment of error is overruled.

{¶ 23} The second assignment of error states:

{¶ 24} "THE TRIAL COURT ERRED IN NOT SUPPRESSING APPELLANT'S STATEMENTS."

{¶ 25} Carter argues that his statements to the police should have been suppressed because the State failed to meet its burden to prove that Carter was informed of his *Miranda* rights before he was interviewed.

{¶ 26} The State presented a videotape in which Carter was informed of and acknowledged his rights while the police were at his apartment, but it included no time-stamp. (The videotape did not include Carter's statements to the police.) A sheriff's deputy and a detective testified at the suppression hearing that the videotape was made within five to ten minutes of when they entered Carter's apartment to execute the search warrant and before he was questioned. Carter testified that the video was recorded one to two hours after the police arrived, when they were getting ready to leave the apartment. He also testified that he had asked for an attorney, but one of the officers "did a kind of hand motion, gesturing me off."

{¶ 27} The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97 CA 03.

{¶ 28} The law enforcement officers and Carter presented conflicting accounts of the circumstances under which he was advised of his rights, particularly the point in time at which he was provided that information. The trial court found that Carter's claim that he was not informed of his rights until after his statements were made was "plausible" but not "credible." The trial court did not clearly lose its way in crediting the

testimony of the law enforcement officers and, thus, did not err in refusing to suppress Carter's statements to them.

{¶ 29} The second assignment of error is overruled.

{¶ 30} The judgment of the trial court will be affirmed.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Elizabeth A. Ellis
Anthony Comunale
Hon. Stephen A. Wolaver