[Cite as *State v. Penque*, 2013-Ohio-4696.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99209**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RICHARD PENQUE

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-555005

**BEFORE:** Keough, J., Boyle, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** October 24, 2013

**ATTORNEY FOR APPELLANT**

Steve W. Canfil
1370 Ontario Street
Standard Building, Suite 2000
Cleveland, OH 44113-1701

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
John F. Hirschauer
Jennifer A. Driscoll
Blaise D. Thomas
Daniel T. Van
Assistant Prosecuting Attorneys
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Richard Penque, appeals from the judgment of the trial court, rendered after a jury verdict, finding him guilty of aggravated murder, aggravated burglary, kidnapping, attempted aggravated arson, and tampering with evidence, and sentencing him to thirty years to life in prison. Finding no merit to the appeal, we affirm.

I. Facts

{¶2} The evidence at trial demonstrated the following. In the morning hours of April 7, 2008, 54-year-old Marilyn Habian was murdered in the basement of her home on Ball Avenue in Euclid, Ohio. She was shot in the heart with a Speer .44 caliber Gold Dot bullet.

{¶3} Marilyn was a teacher at an elementary school and normally signed in for work between 7:30 and 7:50 a.m. At approximately 8:15 a.m. on April 7, 2008, after Marilyn had not signed in, the school secretary called Marilyn's emergency contact and boyfriend of eleven years, Eddie Mitchell, and asked that he check on her.

{¶4} Mitchell, a self-employed artist, was at his home in Eastlake, Ohio that morning. He had risen early, taken a picture of the sunrise from his kitchen window at approximately 7:30 a.m., and then as he was outside taking other pictures, spoke with his neighbor from approximately 7:30 to 7:45 a.m.

{¶5} Mitchell drove to Marilyn's house after he received the call from the school. When he arrived, he saw Marilyn's car, which was running, in the driveway.

After there was no response to his knock, he entered the home through the front door. Mitchell immediately observed that Marilyn's dogs were agitated and there was a smoky haze in the air. He glanced in the dining room and saw Marilyn's purse on the dining room table and raw chicken meat on the floor next to the dogs' dishes. He checked upstairs but did not find Marilyn. Upon entering the kitchen, he saw that the stove top was propped up, the burners and stove were on, and wads of paper were stuffed under the burners in an apparent attempt to ignite a fire.

{¶6} Mitchell then went downstairs to check the basement. He opened the bathroom door, which had been locked from the outside, and discovered Marilyn's body on the floor. Finding no pulse, Mitchell held Marilyn and said goodbye to her. He then called 911. Although the dispatcher told him not to go back in the house, he went back inside and took four or five pictures of the scene, including a picture of Marilyn.

{¶7} Euclid police responded to the 911 call. In the kitchen, they found a glass of milk, peanut butter toast, and a plate of sliced strawberries, which apparently was Marilyn's uneaten breakfast. They also found raw chicken by the dogs' dishes. Marilyn's purse was on the dining room table; its contents were spilled out on the table. There were no signs of forced entry to the home.

{¶8} The police found Marilyn's body in the basement bathroom. She was dressed for work in a flowered skirt and top. From the blood marks on the floor, it appeared that the body had been dragged from the laundry room into the bathroom and the killer had tried to clean up the blood on the floor by pushing it into the floor drain.

A carpet remnant had been laid over the bloody drag marks on the floor; underneath the carpet, the police found a crucifix with a few beads attached to it.

{¶9} The Euclid police subsequently interviewed over 50 people in regard to the murder but by December 2008, the case had gone cold. Every suspect — including Mitchell, Marilyn's son, and her ex-husband — had been excluded.

{¶10} In December 2009, in the hope that someone who saw the show would come forward with information, the Euclid police created an episode regarding some of the details of Marilyn's murder for the Warrant Unit television series. However, the episode produced no new information or further leads in the case.

{¶11} Nearly a year and half later, on April 14, 2011, Bryan Wellinghoff, a prison investigator at the Correctional Reception Center ("CRC") in Orient, Ohio, contacted Euclid police detective Susan Schmid. Wellinghoff told detective Schmid that CRC inmate Joseph Elswick had written a three-page letter that reported very specific details about a murder on Ball Street in Euclid that Elswick had learned from his cellmate Richard Penque.

{¶12} The letter stated that Penque had told Elswick that he was having nightmares in which he could not stop seeing the murdered woman's green eyes. Penque told Elswick that he had broken into the woman's house and was waiting for her to go to work before he robbed it, but her dogs kept barking at the top of the basement stairs. When the woman, who Penque said was wearing a flowered dress and pantyhose, went into the basement and found him, they struggled for a second over the gun before he shot

her in the heart. Penque said that she hit her head when she fell, and he dragged her into the basement bathroom. He then went upstairs, stole some jewelry and cash, and ate some strawberries before he left the house. Penque told Elswick that he had gone to school with the victim's son, Billie, and wanted to steal Billie's video games. He also told Elswick that after he left the scene, he realized he had lost the cross from the rosary he had been wearing, and that he later buried latex gloves, clothes, the gun, and a bloody mop in the backyard of his mother's home in Geauga County. Elswick reported that Penque had also mentioned someone by the name of Erica.

{¶13} After detective Schmid verified that the letter contained details that had not been released to the public in the Warrant Unit episode, she and Euclid police detective Kenneth Kucinski interviewed Elswick, who gave the detectives additional information not contained in the letter. Elswick reported that Penque had also told him that he had tried to feed the dogs raw chicken, and that he had lost the cross from his rosary when he had gone back downstairs and tried to mop up the blood. Elswick also reported that Penque had told him that he had used a .44 caliber gun, which he had buried in his former girlfriend Erica's backyard. Penque also told Elswick that Erica's current boyfriend, Jeffrey, now had the bag with the gun.

{¶14} On May 10, 2011, the detectives interviewed Penque, who denied ever meeting Marilyn. The detectives told Penque that his DNA had been found at the scene (which was not true) and showed him the crucifix recovered from the crime scene, but Penque denied ever wearing or owning a rosary.

{¶15}   A week later, upon learning that Penque had been transferred to Mansfield Correctional Institution, Detective Schmid contacted Karen Hunsinger, an institutional investigator at Mansfield, and asked her to monitor Penque's telephone calls.   Hunsinger also placed Jamison Kennedy, a Mansfield inmate and informant, in Penque's cell to see if Penque would confide in him.   As he had done with Elswick, Penque told Kennedy the details of the murder, including that before committing the burglary, he had kissed the cross on the rosary he was wearing for good luck but part of the necklace had been left at the scene.   Penque initially told Kennedy that he had buried the gun near a jacuzzi in the backyard of his mother's house in Chesterland, Ohio; later he told him that he had given the gun to his neighbor Erica and that Erica's boyfriend had done something with the gun.

{¶16}   The Euclid police subsequently determined that Penque lived on Ball Avenue in Euclid at the time of the murder and later moved to Chesterland, Ohio.   They also learned that the "Erica" referred to by Elswick and Kennedy was Erica Judson, Penque's ex-girlfriend and next-door neighbor in Chesterland.   The police subpoenaed Penque's institutional phone records and learned that on January 3, 2011, Penque had spoken to Erica's husband, Jeffrey Busser, and Busser had told Penque "I took care of that."   The next day, Penque spoke with his sister Heather about a "clip from a big thing."

{¶17}   The police questioned Erica and Busser in September 2011.   Erica told the police that in August 2008, Penque told her he had put a black trashbag in her backyard

and, a few days later, she took the bag to Busser, who was living with his mother in Munson, Ohio. Busser subsequently led the police to the black bag, which he had hidden in a dense field behind his mother's home. Inside and around the bag, the police found a bottle of gun oil, a black ski mask, size 11 tennis shoes, a baseball bat, a pair of blue latex gloves, and Speer .44 caliber Gold Dot bullets.

{¶18} As part of their investigation, the police executed a search warrant for the Ball Avenue property where Penque lived at the time of the murder. In the garage, they found a box labeled "Rick's Desk." Beneath the box, they found newspaper articles about Marilyn's life and her obituary. In the box, they found a composition book that contained, among other drawings, a drawing of a rosary missing two beads and without a crucifix, and with what appeared to be tears coming out of the end of the rosary.

{¶19} Penque testified at trial. He said that he lived on Ball Avenue until July 2008, when he moved to Chesterland. He admitted that in August 2008, after a party at the Chesterland home, he hit one of the attendees with a baseball bat, and was subsequently convicted of aggravated assault and sentenced to 17 months in prison. Penque admitted that Elswick was his cellmate at Orient CRC, and said that he had discussed Marilyn's murder with Elswick after hearing about it "from around the neighborhood." Penque likewise said that he discussed the details of Marilyn's murder with Kennedy based on "stuff around the neighborhood" that he had heard. He said that his lifelong friend Bryan Schiffbauer told him what was stolen from Marilyn's home and

about the crucifix found at the murder scene; a claim refuted by Schiffbauer, who testified that he never discussed the murder with Penque.

**{¶20}** Penque denied killing Marilyn and said that he saw her getting in her car at approximately 8:00 a.m. the morning she was murdered as he was leaving his uncle's house to drive to Tops, the bank, and the gas station. He said that at 9:48 a.m. that morning, he deposited $80 in cash at a nearby credit union and at 10:05 a.m. that day, when he was back at the house, he spoke with a Euclid policeman who was canvassing the area.

**{¶21}** Penque admitted that after the August 2008 assault incident, he put a bat, a marijuana bong, some Speer .44 caliber Gold Dot bullets, and gun oil in a trash bag and buried it under some leaves in Erica's yard, and that he told Erica about the bag. He also admitted that when he telephoned his sister Heather from prison about the "clip from a big thing" she told him that "Jeffrey's got your back." He further admitted that he had lied to the detectives during his interview at CRC when he told them that he had never worn a rosary and had never met Marilyn. He also admitted that he had sketched the rosary with the missing beads and teardrops in the composition book but said it was a drawing of a tattoo he wanted to get.

## II.  Analysis

A.  Evidentiary Issues

**{¶22}** In his first assignment of error, Penque contends that the trial court violated his rights to confrontation of witnesses and due process by admitting improper evidence and excluding exculpatory evidence.

**{¶23}** The trial court has broad discretion in the admission or exclusion of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should be slow to interfere. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 122. "An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable." *State ex rel. Stiles v. School Emps. Retirement Sys.*, 102 Ohio St.3d 156, 2004-Ohio-2140, 807 N.E.2d 353, ¶ 13.

1. Joseph Elswick's Testimony

**{¶24}** Penque first takes issue with the admission of Elswick's testimony. Elswick and Penque were cellmates in the mental health facility at Orient CRC in March and April 2011. Elswick, who testified that he has been diagnosed with schizoaffective disorder, bipolar disease, and post-traumatic stress disorder, was paroled a few months after he wrote his letter detailing what Penque had told him about Marilyn's murder. Shortly thereafter, he reoffended, and was arrested and jailed. After the Ashtabula County Common Pleas Court ordered a competency evaluation, the court psychiatrist issued an opinion finding Elswick not competent to stand trial. Elswick was incarcerated at a state forensic psychiatric hospital awaiting restoration of his competency when he testified at Penque's trial. Penque contends that the trial court erred in admitting

Elswick's testimony because the state failed to demonstrate that he was competent to testify.

{¶25} The determination of witness competency is within the trial court's discretion. *State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991). Under Evid.R. 601, "[e]very person is competent to be a witness except: (A) those of unsound mind, and children under ten years of age, who appear incapable of receiving just impression of the facts and transactions respecting which they are examined, or relating them truly."

{¶26} A witness of "unsound mind" is not automatically incompetent to testify. *State v. Bradley*, 42 Ohio St.3d 136, 140, 538 N.E.2d 373 (1989). "A person who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind." *Id.*, quoting *State v. Wildman*, 145 Ohio St. 379, 61 N.E.2d 790 (1945), paragraph three of the syllabus.

{¶27} Penque cites *State v. Braden*, 56 Ohio App. 19, 9 N.E.2d 999 (1936), for the proposition that a witness's mental illness shifts the burden to the state to show that the witness is competent to testify. *Braden* held that where a "witness whose competency is questioned is under commitment for insanity, the burden of proof rests upon the state to show the competency of such witness." *Id. Braden*, however, was decided before *Bradley*, wherein the Ohio Supreme Court stated its view that a witness of unsound mind is not automatically incompetent to testify. Accordingly, *Braden* is not

persuasive authority. *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 17 (2d Dist.).

**{¶28}** Here, the trial court held a hearing, and the prosecutor and defense counsel questioned Elswick about his prior delusional thoughts, current mental state, medications, age, where he was born, and who the president of the United States was. Elswick was able to understand and answer all the questions. The state also questioned Elswick regarding the legal significance of taking an oath to tell the truth and the consequences of lying, which Elswick understood. The trial court ruled that Elswick was "capable of receiving just impressions of fact and relating them truthfully." We find no abuse of discretion in the trial court's ruling. A review of Elswick's testimony indicates that he was able to perceive, recollect, and relate facts truthfully.

2.      Jamison Kennedy's Testimony

**{¶29}** Penque next contends that Jamison Kennedy's testimony was inadmissible because the state purposely placed Kennedy in his cell in an attempt to elicit incriminating information from him and, therefore, Kennedy was acting as a state agent when he questioned him, without the benefit of *Miranda* warnings and in violation of his right to counsel.

> The rights protected by the Fifth and Sixth Amendments are compatible, although not identical. The [United States] Supreme Court [has] determined that any suspect subject to a custodial interrogation, regardless of whether formal criminal proceedings have begun, must be given notice of his Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That privilege necessarily includes the right to have counsel present at an interrogation; *id.* at 469-71, as reflected in the standard warning developed

by the Court in *Miranda*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444.

Unlike the Fifth Amendment, the Sixth Amendment applies only after the initiation of formal criminal proceedings, such as the filing of an indictment. *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir.2003), citing *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). Once the Sixth Amendment has attached, the government may not "deliberately elicit" incriminating statements from the defendant without the presence of his attorney. *See United States v. Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (outlining the deliberate-elicitation standard).

*United States v. White*, S.D.Ohio No. 1:11-cr-071-3, 2012 U.S. Dist. LEXIS 174163 (Dec. 7, 2012).

{¶30} In this case, Penque did not object to Kennedy's testimony and, accordingly, waived all but plain error. *State v. Loza*, 71 Ohio St.3d 61, 75, 1994-Ohio-409, 641 N.E.2d 1082. Plain error is recognized where, but for the error, the result of the trial would clearly have been otherwise. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶31} With respect to Penque's Fifth Amendment right to counsel, even assuming without deciding that Kennedy was acting as a state agent, there is simply no evidence that he interrogated Penque. In fact, Kennedy testified that Penque "initiated it [the conversation] himself" because he was worried and "he kind of just told me these things on his own." Accordingly, we find no violation.

{¶32} With respect to Penque's Sixth Amendment right to counsel, when Penque spoke with Kennedy, he was incarcerated on felonious assault convictions. No formal

proceedings relative to Marilyn's murder had been initiated or filed against him; hence, his Sixth Amendment right to counsel was not implicated and there was no violation. Moreover, even if the admission of Kennedy's testimony were error, we find it to be harmless error in light of the significant other evidence at trial that established Penque's guilt. *See Ayers v. Hudson*, 623 F.3d 301, 317, n.12 (6th Cir.2010) (such violations are subject to harmless-error analysis).

3.      Edward Mitchell's Testimony

**{¶33}** The trial court granted the state's motion in limine to preclude defense counsel from disclosing to the jury that Mitchell had failed a polygraph examination. Penque contends that the trial court's decision to grant the motion in limine was an abuse of discretion because, since Mitchell's behavior when he discovered the body was so bizarre, the jury could well have reached a different conclusion about Penque's guilt if they had been told that Mitchell had failed a polygraph test.   Penque did not object to the state's motion and, therefore, waived all but plain error. We find no error, plain or otherwise, in the trial court's granting of the motion.

**{¶34}**   The criteria for the admission of polygraph examination results was set forth in *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978).   One criterion is that all parties must stipulate to the admission of the test results.   The Supreme Court explained:

> The nature of polygraphs is different from traditional scientific tests.   Most, if not all, scientific tests involved objective measurements such as blood or genetic typing or gunshot residue.   In a polygraph test, the bodily response of the examinee to his answers is dependent upon the subjective

interpretation thereof by the examiner. Inasmuch as the test is not perceived by the profession to be reasonably reliable, its admissibility is limited in Ohio to situations where the parties stipulate to its admission.

*State v. Davis*, 62 Ohio St.3d 326, 341, 581 N.E.2d 1362 (1991).

{¶35} No such stipulation was entered into in this case and, therefore, the trial court did not abuse its discretion in granting the state's motion to exclude any reference to the test results.

{¶36} Moreover, Penque's argument that the jury may have found reasonable doubt of his guilt if they were aware that Mitchell failed the polygraph test is not supported by the evidence. Marilyn's neighbor testified that he saw Marilyn in her kitchen at 6:30 to 6:40 a.m. that morning, and that she normally left for work at 7 a.m.; hence, the police concluded that the murder occurred sometime between 6:30 and 7 a.m. Mitchell's neighbor testified that he went outside at 6:45 a.m. that morning and saw Mitchell's lights on in his home and both of his cars in his driveway. At 7:30 a.m. that morning, Mitchell took a picture from his kitchen window, and from approximately 7:30 to 7:45 a.m., he stood outside and spoke with his neighbor. Detective Schmid testified that because Mitchell could not have been in two places at the same time, the police eliminated him as a suspect.

4.    The Warrant Unit Video

{¶37} Penque next argues that the judge abused his discretion in allowing the state to play the Warrant Unit video for the jury because it was unduly prejudicial and,

therefore, inadmissible.[1]  But Penque stipulated at trial to the admission of the video and, in fact, argued during closing argument that Elswick and Kennedy's testimony was false because they learned the details of Marilyn's murder from the video and not from him. "[A] criminal defendant may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error."  *State v. Doss*, 8th Dist. Cuyahoga No. 84433, 2005-Ohio-775, ¶ 7.  Under the invited error doctrine, a party is not entitled to take advantage of an error that he himself invited or induced. *State v. Campbell*, 90 Ohio St.3d 320, 324, 2000-Ohio-183, 738 N.E.2d 1178.  Any alleged error was invited by Penque and, accordingly, we find no merit to this argument.

5.     Video Recording of Police Interview of Penque

**{¶38}**  Last, Penque contends that the trial court abused its discretion in admitting the video recording of his interview with detectives Schmid and Kucinski.  He contends that the video was unduly prejudicial and misleading because it contained false information that his DNA was found at the scene and that it violated his due process rights and right against self-incrimination because it showed that he became uncooperative and asked for a lawyer when the detectives showed him the cross found at the scene.  We find no abuse of discretion.

---

[1]Evid.R. 403(A) provides: "(A) Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶39}** Detective Kucinski testified that the detectives falsely told Penque that his DNA was found at the scene as a technique to see if he would confess to the murder. And Lisa Moore, a forensic scientist in the Cuyahoga County medical examiner's office, testified that none of Penque's DNA was found on any of the items or swabs from Marilyn's home. Thus, the jury was aware that despite the detectives' statement to Penque during the videotaped interview, none of his DNA was found at the scene.

**{¶40}** We also find no violation of Penque's rights to due process and against self-incrimination. The jury was not shown the portion of the recording in which Penque invoked his *Miranda* rights, nor was there any mention during trial that Penque had invoked his rights after the detectives *Mirandized* him. Accordingly, we find no abuse of discretion in the admission of the videotaped interview.

**{¶41}** The first assignment of error is therefore overruled.

B.    Sufficiency of the Evidence

**{¶42}** In his second assignments of error, Penque contends that his convictions were not supported by sufficient evidence.

**{¶43}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶44} Penque does not argue that the evidence was insufficient to establish the elements of the crimes of which he was convicted — only that the evidence was insufficient to prove he was the perpetrator. Specifically, he contends that the there was no scientific evidence linking him to the murder because neither his DNA nor fingerprints were found at the scene, and there was unidentified DNA on several items, including the side door dead-bolt lock through which the murderer allegedly entered the home, and a bloody envelope discovered next to Marilyn's body.

{¶45} But Penque's argument ignores the extensive circumstantial evidence that tied him to the crimes. Penque provided detailed accounts of the murder to Elswick and Kennedy, including details not known to the public from the Warrant Unit video — that Penque shot Marilyn with a .44 caliber gun, that he lost the crucifix from his rosary at the scene, and that he disposed of a bag that contained items related to the murder, including latex gloves, in Erica Judson's backyard.

{¶46} Penque's admissions to Elswick and Kennedy were corroborated by physical evidence: Marilyn was shot in the heart with a Speer .44 caliber Gold Dot bullet, the same type of bullets Penque said he buried in the trashbag; Erica and Busser admitted that they had disposed of a plastic bag for Penque; the latex gloves recovered from the trash bag tested presumptive positive for blood; Penque admitted at trial that he

had worn a rosary in the past; the cross discovered by the police at the scene had a few beads attached to it; and the drawing of the rosary in Penque's composition book, which Penque admitted he drew, was of a rosary without a crucifix and missing two beads, with tears coming out of the end of the beaded rosary.

{¶47} This evidence was more than sufficient to establish that Penque was the perpetrator of the crimes. Contrary to Penque's assertions, the state was not required to present evidence that his DNA or fingerprints were found at the scene, and the presence of unidentified DNA at the scene does not exclude him as the murderer. In light of the extensive evidence linking Penque to the crimes, the evidence was sufficient to support his convictions.

{¶48} The second assignment of error is overruled.

C.    Manifest Weight of the Evidence

{¶49} "A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion." *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus.

**{¶50}** In his third assignment of error, Penque contends that his convictions were against the manifest weight of the evidence because the evidence against him was entirely circumstantial and based upon the testimony of "jailhouse snitches" who sought and received leniency for their testimony. Penque's arguments have no merit.

**{¶51}** First, circumstantial evidence alone is sufficient to support a conviction; physical evidence is not required. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph two of the syllabus; *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 62, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In this case, however, in addition to the significant circumstantial evidence linking Penque to the murder, there was also physical evidence that corroborated the details about the murder that Penque disclosed to Elswick and Kennedy.

**{¶52}** Moreover, despite Penque's assertions otherwise, neither Elswick nor Kennedy received anything in exchange for their testimony against him. Kennedy testified that neither detective Schmid, detective Kucinski, nor the prosecutor's office promised him anything in exchange for his cooperation and, in fact, that he did not receive any special benefit for his testimony. Elswick had already appeared before the parole board and been recommended for parole before Penque told him about the murder. He testified that he came forward because he wanted to "do something right for once in my life" and that he had no deal with the prosecutor for any special benefit in exchange for his testimony.

**{¶53}** Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial is reserved for only those "exceptional cases in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. This is by no means that exceptional case. Although Penque complains that the evidentiary "puzzle pieces" did not fit together to establish that he was the murderer, our review of the record demonstrates that the jury did not lose its way or create a manifest miscarriage of justice in convicting him of aggravated murder, aggravated burglary, kidnaping, attempted aggravated arson, and tampering with evidence. The third assignment of error is therefore overruled.

D.    Prosecutorial Misconduct

**{¶54}** In his fourth assignment of error, Penque contends that he was denied his rights to due process and a fair trial because of a "pervasive pattern of prejudicial prosecutorial misconduct that infected the entire trial."

**{¶55}** The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether it prejudicially affected the substantial rights of the accused. *State v. Jones*, 90 Ohio St.3d 403, 420, 2000-Ohio-187, 739 N.E.2d 300. The effect of the alleged misconduct must be judged in the context of the entire trial, and not treated as an isolated incident in an otherwise properly tried case. *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 58. Accordingly, an appellate court should only reverse a conviction if the effect of the misconduct "permeates the entire atmosphere of the trial," such that the defendant has been denied a fair trial. *Id.*, citing *State v.*

*Tumbleson*, 105 Ohio App.3d 693, 696, 664 N.E.2d 1319 (12th Dist.1995). In analyzing whether a defendant was deprived of a fair trial, an appellate court must determine beyond a reasonable doubt whether, absent the improper questions or remarks, the jury would have found the defendant guilty. *State v. Maurer*, 15 Ohio St.3d 239, 266-267, 473 N.E.2d 768 (1984).

{¶56} Penque first contends that the prosecutor had no authority to cause Elswick to be transported from the state psychiatric facility to Cuyahoga County Common Pleas Court to testify because he was under the jurisdiction of the common pleas court of Ashtabula County. This argument is without merit. Under R.C. 1907.18, county court judges have jurisdiction and authority to issue subpoenas to compel witnesses to testify in matters pending before the judge. Such subpoenas may be served at any place within the state of Ohio. Crim.R. 17(F).

{¶57} Penque next asserts that his and Elswick's constitutional rights were violated because the prosecutor did not inform Elswick's lawyer in the Ashtabula County case about Elswick's testimony in Cuyahoga County. This argument likewise fails. As discussed earlier, the Fifth Amendment right to counsel applies when an individual is a suspect subject to a custodial interrogation; the Sixth Amendment right to counsel attaches after formal criminal proceedings have been filed. But Elswick was not a suspect undergoing custodial interrogation when he testified at Penque's trial, nor had criminal charges relating to Marilyn's murder been filed against him. Moreover, Elswick

signed a written waiver of any right to counsel regarding his testimony in Penque's case. Accordingly, there was no constitutional violation nor any prosecutorial misconduct.

{¶58} Penque next argues that the prosecutor somehow "blind sided" defense counsel with Elswick's testimony. He asserts that defense counsel was not provided with adequate time to obtain information and testimony from the Ashtabula County court psychiatrist who had evaluated Elswick and thus, that counsel could not adequately prepare for cross-examination of Elswick. This argument is likewise without merit. The record demonstrates that defense counsel was aware for months that Elswick was a prospective witness, and that both the prosecutor and defense learned of the court psychiatrist's report declaring Elswick incompetent to assist in his defense in the Ashtabula County case only after trial had started. The state then procured Elswick's psychiatric records and provided them to defense counsel, who, after reviewing the records, conducted an extensive, detailed, and effective cross-examination of Elswick.

{¶59} Penque also argues that in light of Elswick's mental history and false statements to the jury, the prosecutor committed misconduct by allowing him to testify. This argument also fails. Elswick's competency to testify was determined by the trial judge after a full voir dire hearing in which Penque had an opportunity to cross-examine Elswick on his history of delusions and current mental health. At trial, Elswick's mental history and current mental state were discussed at length on both direct and cross-examination; thus the jury was fully aware of Elswick's mental health and was able to judge his testimony accordingly. Moreover, there is nothing in the record to suggest

that Elswick misled the jury in any way and, in fact, much of his testimony was corroborated by Kennedy and the physical evidence.

{¶60} Last, Penque takes issue with the prosecutor's closing argument. He contends that the prosecutor withheld "exculpatory evidence" from the jury that Mitchell had failed a polygraph exam and then "mischaracterized" the evidence in closing by arguing that Mitchell had been excluded as a suspect and calling Penque "a coward and a liar." We find no misconduct.

{¶61} In *State v. Davis*, 62 Ohio St.3d 326, 341, 581 N.E.2d 1362 (1991), the Ohio Supreme Court determined that due to their scientific unreliability, polygraph examination results of prosecution witnesses are not considered exculpatory material discoverable under either Crim.R. 16 nor *United States v. Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[2] Furthermore, as discussed above, the trial court properly excluded the results of Mitchell's polygraph examination at trial. Accordingly, the state did not withhold exculpatory evidence from the jury by not telling them that Mitchell had failed a polygraph examination.

{¶62} Nor do we find that the prosecutor "mischaracterized" the evidence in closing by arguing that Mitchell had been excluded as a suspect and Penque was "a coward and a liar." Detective Schmid testified that the police had investigated Mitchell after the murder but eliminated him as a suspect because he had an alibi. And on

---

[2] In *Brady*, the United States Supreme Court determined that the due process clause requires the states to disclose to the defendant evidence that is both favorable to the defendant and material to either guilt or punishment.

cross-examination, Penque admitted that he lied to the police when he told them that he had never worn a rosary and had not met Marilyn. Although referring to or alluding to a defendant as a liar is generally improper, a prosecutor may call a defendant a liar during closing argument if the statement is supported by the evidence at trial. *State v. Tyler*, 50 Ohio St.3d 24, 553 N.E.2d 576 (1990).

**{¶63}** We find no prosecutorial misconduct in this case and accordingly, overrule the fourth assignment of error.

E.    Jury Instructions

**{¶64}** In his fifth assignment of error, Penque argues that he was denied his right to a fair trial because the trial court did not give his proposed jury instructions.

**{¶65}** Ordinarily, requested instructions should be given if they are correct statements of the law applicable to the facts in the case. *Murphy v. Carrolton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). The trial court is not required to use the proposed jury instruction verbatim; the court need only include the substance of the proposed instruction. *Youssef v. Parr*, 69 Ohio App.3d 679, 690, 591 N.E.2d 762 (8th Dist.1990).

**{¶66}** A trial court's decision on jury instructions is treated with deference, and an appellate court will not reverse absent an abuse of discretion. *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 37 (8th Dist.), citing *Jaworowski v. Med. Radiation Consultants*, 71 Ohio App.3d 320, 327-328, 594 N.E.2d 9 (2d Dist.1991) To show reversible error, the proponent of the instruction must

show both that the trial court's refusal to give the instruction was an abuse of discretion and that he was prejudiced by the court's refusal to give the proposed instruction. *Id.* Thus, this court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict. *Youssef* at 691.

**{¶67}** Penque requested that the trial court instruct the jury that it is permissible for the state to use an informant, but informant testimony must be examined and weighed by the jury with "greater caution" than the testimony of a witness who is not motivated to testify for personal reasons or advantage. Penque refers us to R.C. 2923.03(D), which provides that testimony from accomplices is subject to "grave suspicion" and should "be weighed with great caution." He contends that informant testimony is similar to accomplice testimony and, therefore, the trial court erred in not including the "greater caution" language with respect to Elswick and Kennedy's testimony.

**{¶68}** Although it did not give Penque's proposed "greater caution" instruction, the trial court instructed the jury that in addition to evaluating an informant's testimony as it would the testimony of other witnesses, it "should also specifically examine whether the informant's testimony has been at all affected by any self-interest of the informant." This instruction was, in substance, similar to Penque's proposed instruction and accordingly, we find no abuse of discretion.

**{¶69}** Penque next contends that the trial court abused its discretion in not instructing the jury, as proposed, that in determining the credibility of witnesses, it should consider, among other things, "the existence of mental illness or the lack thereof" and the

witness's prior convictions. The trial court instructed the jury, however, that in determining the credibility of a witness, in addition to the other factors enumerated by the court, "you may consider any other facts and circumstances surrounding the testimony which, in your judgment, would add to or detract from the credibility and weight of the witness's testimony." This instruction was, in substance, similar to Penque's proposed instructions and, accordingly, we find no abuse of discretion.

{¶70} The fifth assignment of error is therefore overruled.

{¶71} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, P.J., and
TIM McCORMACK, J., CONCUR