[Cite as *State v. Campbell*, 2014-Ohio-493.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99807**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DEVONTE CAMPBELL

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED; REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-563469 and CR-563469-A

**BEFORE:** Keough, J., Jones, P.J., and S. Gallagher, J.
**RELEASED AND JOURNALIZED:** February 13, 2014

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Brian D. Kraft
       Brent C. Kirvel
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1}   Defendant-appellant, Devonte Campbell, appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of attempted murder,  carrying a concealed weapon, having a weapon while under a disability, and improperly handling firearms in a motor vehicle, and sentencing him to 24 years in prison.  For the reasons that follow, we affirm Campbell's convictions and sentence, but remand for the trial court to issue a nunc pro tunc sentencing entry crediting Campbell with 363 days jail-time credit.

## I.   Background

{¶2}   Campbell was charged in a ten-count indictment stemming from a shooting on September 14, 2011.  He pled not guilty to the charges, and the matter proceeded to a jury trial.

{¶3}   Rodney Williams testified at trial that he met his cousin, Otez Hutson, at the Olive Twist bar in Euclid on the evening of September 14, 2011.  Williams said that a tall light-skinned male with tattoos bumped him when he was on the dance floor, causing him to spill his drink, and Williams and Hutson argued with this male and the male's friends until security broke up the argument.  After Hutson left the bar, Williams got another drink and went back to the dance floor.  A short time later, he saw Irshad

Malone, a friend of Hutson's, arguing with some of the same males they had argued with earlier. Williams saw security personnel go over to break up the argument and then "everything just got blurry." Upon realizing that he had been shot in the stomach, Williams walked out of the bar, sat down, and waited for an ambulance. Williams testified that he did not see who shot him.

{¶4} Irshad Malone testified that at approximately 11:30 p.m. on September 14, 2011, he, his brother Nemon Hobbs, and his cousin Alan Burke, pulled in the parking lot of the Olive Twist and parked in the second row facing the door. As they were sitting in their car smoking and drinking, an SUV pulled up on their left and parked next to them. Malone saw a man and woman get out of the SUV and walk to the door of the bar; he then saw the male come back to the SUV, put a bulletproof vest in the vehicle, and go back in the bar.

{¶5} Malone, Hobbs, and Burke eventually went in the bar, where Malone saw his friend "Tez," who introduced him to Williams. Later, when Tez left the bar, he told Malone to "make sure my cousin [*i.e.*, Williams] cool." Malone testified that he later saw Williams arguing with several males, so he went over and told everyone to "just let it be." The individuals separated, and Malone thought the incident was over, but approximately 15 minutes later, he heard a gunshot. Malone ran out of the bar to his car and was trying to open the driver's side door when he was shot in the back. He testified

that the shot spun his body around 180 degrees so he was facing the SUV that was parked next to him. Malone said that Campbell was sitting in the rear passenger seat closest to him, and the window was down. As the SUV pulled away, Malone saw Campbell looking at him with a "weird" smile.

{¶6} Nemon Hobbs testified that Malone was ahead of him as they ran to their car after hearing the gunshot in the bar. Hobbs said that he saw Campbell and several other people running to the SUV that was parked next to their car, and saw Campbell get in the back seat. Hobbs testified that as Malone was trying to get in the driver's seat of their car, he saw a hand with a gun come out of the open window on the passenger side of the SUV; he then saw a flash, heard a shot, and saw Malone "flip around the car." Hobbs acknowledged that he did not see who shot his brother but testified that he later picked Campbell out of a photo array because he recognized him as the male with the bulletproof vest who was involved in the altercation in the bar and who Hobbs saw running to the SUV moments before his brother was shot.

{¶7} Alan Burke testified that as he sat in the car with Malone and Hobbs before going in to the Olive Twist that evening, he saw Campbell walk back to the SUV that was parked next to them, take off his bulletproof vest, put it in the car, and walk back into the bar. Ten minutes later, Burke saw a female walk to the SUV, open the back door, close it, and then go back into the bar. Burke testified that the male who returned the

vest to the SUV had dreadlocks and that he stood out in the bar that evening because only one or two other people in the bar had dreadlocks.

{¶8} Benjamin Sims, who was working security on the dance floor at the Olive Twist the evening of September 14, 2011, testified that it seemed as if two groups of males were "at each other" throughout the night. He said that he broke up an argument and ejected some males but they somehow got back in the bar. Sims said that later, as he stood near the dance floor, he saw one of those males, who was only three or four feet away from him, reach down towards his waist, pull a pistol out, and pull the trigger. Sims then heard a shot.

{¶9} Later that evening, Sims reviewed surveillance tape from the bar with Terry Howell, the owner of the Olive Twist; Larry Jackson, who was also working security at the bar that night; and several Cleveland police officers; and pointed out the male who had fired the shot. The tape was played in court during Sims's testimony without any defense objection, and Sims identified a male with a plaid shirt on as the person he saw fire the gun.

{¶10} Larry Jackson, who was working security at the door on September 14, 2011, testified that he patted down a male who was wearing a bulletproof vest and told him that he could not wear the vest in the bar. After putting the vest in his car, the male returned to the bar. Jackson said that he intervened in several altercations involving the

same male that evening, and at one point, he put the male up against the wall and told him to calm down or he would be ejected.

{¶11} Jackson testified that he reviewed surveillance tapes after the shootings and identified the male with the bulletproof vest in the video. In court, over defense counsel's objection, Jackson identified a male wearing a plaid shirt — the same male Sims had pointed out in the videotape — as the male with the bulletproof vest who was involved in the altercations in the bar that evening. Jackson also identified Campbell in court as the individual he recognized on the videotape.

{¶12} Cleveland police responded to the shootings at the Olive Twist and recovered two .40 caliber bullet casings, one from the dance floor and another from the parking lot. The police also spoke with Hobbs and Burke at Hillcrest Hospital later that evening and observed a bullet hole in the driver's side door of the car of the car that Malone, Hobbs, and Burke had been using that night.

{¶13} Terry Howell, the owner of the Olive Twist, testified that he called the police on December 2, 2011, because the male that Sims had identified as the shooter from the September 14, 2011 surveillance video had tried to enter the bar that evening with several other males but had been turned away. Howell told the police that the male was wearing an orange polo shirt and gave them the license plate number of the vehicle he was in.

{¶14} According to Thomas Coyne, a Euclid police officer, a police chase ensued and the suspect vehicle eventually flipped over and crashed. Campbell, who was wearing an orange polo shirt, was ejected from the vehicle, as was another passenger; a third occupant was found in the car. The police found two guns on the roof of the flipped vehicle. Mike Roberts, a forensic scientist at the Bureau of Criminal Investigation, testified that the two fired casings found at the Olive Twist on September 14, 2011, were fired from one of the guns recovered from the vehicle.

{¶15} Months after this incident, Cleveland police detective Mitch Houser took over the investigation. At his direction, the police separately showed Hobbs and Malone different photo arrays, and they both identified Campbell as the male they recognized from the Olive Twist on September 14, 2011.

{¶16} Campbell was subsequently indicted on a ten-count indictment. Counts 1 and 2 charged the attempted murder of Williams and Malone in violation of R.C. 2923.02 and 2903.02(A); Counts 3 and 4 charged felonious assault by serious physical harm to Williams and Malone in violation of R.C. 2903.11(A)(1); Counts 5 and 6 charged felonious assault by means of a deadly weapon or dangerous ordnance in violation of R.C. 2903.11(A)(2); Count 7 charged carrying a concealed weapon in violation of R.C. 2923.12(A)(2); Count 8 charged having weapons while under a disability in violation of R.C. 2923.13(A)(3); Count 9 charged illegal possession of a firearm in a liquor permit

establishment in violation of R.C. 2923.121(A); and Count 10 charged improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B). Counts 1 through 6 carried one- and three-year firearm specifications pursuant to R.C. 2941.141(A) and 2941.145(A).

{¶17} At the close of the state's case, the trial court granted defense counsel's Crim.R. 29 motion on Count 9. The jury found Campbell guilty of Counts 1 through 7 and 10; the trial court found him guilty of Count 8. At sentencing, the trial court found that Counts 1, 3, and 5 merged, as did Counts 2, 4, and 6 (attempted murder and felonious assault). The state elected to proceed to sentencing on Counts 1 and 2 (attempted murder), and the trial court sentenced Campbell to nine years on each count, plus three years consecutive on each of the attached firearm specifications. The trial court sentenced Campbell to 12 months concurrent on each of the remaining counts, for a total of 24 years incarceration. Campbell now appeals from this judgment.

## II.   Analysis

A.   Motion to Suppress

{¶18} In his first assignment of error, Campbell contends that he was denied due process when the trial court denied his pretrial motion to suppress Malone and Hobbs's identification from the photo arrays.

{¶19} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Consequently, we give deference to the trial judge's factual findings, but we review the application of law to fact de novo. *Id.*; *see also State v. Davis*, 8th Dist. Cuyahoga No. 83033, 2004-Ohio-1908.

{¶20} In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that an identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process.

{¶21} In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934, ¶ 42, citing *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19.

{¶22} A photo array is not unduly suggestive where it contains individuals with features similar to the suspect. *State v. Jones*, 8th Dist. Cuyahoga No. 85025, 2005-Ohio-2620, ¶ 15. "Where the men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo

background, the photo array is not impermissibly suggestive." *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 69, citing *State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶ 18.

{¶23} Campbell asserts that the array shown to Malone (state's exhibit No. 44) was unduly suggestive and unreliable because he is wearing a bright shirt in his picture and is the only person pictured with a tattoo. He contends that the array shown to Hobbs (state's exhibit No. 45) was unduly suggestive because he is wearing an orange shirt, the color of jail clothing.

{¶24} Upon review of the arrays, we do not find either to be unduly suggestive. The five other men in the arrays with Campbell all appear relatively similar to him in age, features, skin tone, and facial hair. Furthermore, in exhibit No. 44, although Campbell is wearing a yellow shirt against a blue background, another male is wearing a blue shirt against a yellow background, as bright a contrast as that in Campbell's photo. In exhibit No. 45, three of the other males are wearing reddish-orange coats or sweatshirts that are very similar in color to the orange shirt worn by Campbell.

{¶25} Campbell also argues that the photo arrays should have been suppressed because they did not comply with the requirements of R.C. 2933.83(B) regarding photo lineup identifications. Campbell did not raise this argument in the trial court, however, and thus has waived it for purposes of appeal. *Jacubenta v. Cadillac Ranch*, 8th Dist.

Cuyahoga No. 98750, 2013-Ohio-586, ¶ 18; *Thompson v. Preferred Risk Mut. Ins. Co.*, 32 Ohio St.3d 340, 342, 513 N.E.2d 733 (1987). Nevertheless, Detective Houser testified at trial that the photo arrays were compiled and presented in accord with the procedures of R.C. 2933.83(B).

**{¶26}** Because Campbell failed to demonstrate that the photo array procedures were unduly suggestive, the first prong of the *Biggers* test, we need not consider the second prong of the test, i.e., whether the identifications, viewed under the totality of the circumstances, were reliable despite their suggestive nature. The first assignment of error is overruled.

B.     Sufficiency of the Evidence

**{¶27}** In his second assignment of error, Campbell contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because his convictions were not supported by sufficient evidence.

**{¶28}** Crim.R. 29(A) provides for a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶29} "A long-established principle of criminal law is that the prosecution must prove 'beyond a reasonable doubt' the identity of the accused as the person who actually committed the crime." *Cleveland Metroparks v. Lawrence*, 8th Dist. Cuyahoga No. 98085, 2012-Ohio-5729, ¶ 13, quoting *In re K.S.*, 8th Dist. Cuyahoga No. 97343, 2012-Ohio-2388. Campbell contends that his convictions were not supported by sufficient evidence because the state failed to establish that he was the shooter at the Olive Twist on September 14, 2011. He argues that both Williams and Malone testified that they did not see who shot them, and that no one identified him as the shooter. He argues further that although Sims identified the shooter from the videotape, he did not identify Campbell in court as the person he saw on the videotape. And he contends that although Hobbs and Malone identified him from the photo array as someone they recognized from September 14, 2011, neither individual identified him as the shooter.

{¶30} We find that the state offered sufficient evidence that Campbell was the shooter. Both immediately after the incident on September 14, 2011, and when the tape was played for the jury, Sims pointed out the male who fired the weapon inside the bar on the video surveillance tape. Jackson identified the same male from the tape as the person with the bulletproof vest who kept getting into altercations in the Olive Twist that

evening. Hobbs identified Campbell as the male with the bulletproof vest and the individual that he saw running to and getting in the back seat of the SUV moments before Malone was shot. And Malone testified that when his body spun around after he was shot, he saw Campbell smiling weirdly at him from the back seat of the SUV. Malone also identified Campbell in court as the man he saw in the back seat of the SUV immediately after he was shot.

{¶31} Furthermore, on December 2, 2011, Terry Howell recognized Campbell when he tried to return to the bar that evening, called the police, and told them that the "shooter" in the September 14, 2011 incident had tried to re-enter the bar. When the police apprehended Campbell after the police chase, he was wearing an orange polo shirt, the shirt Howell had told the police the "shooter" was wearing. Viewing this evidence in a light most favorable to the prosecution, there was sufficient evidence that Campbell was the shooter.

{¶32} Campbell also contends there was insufficient evidence to support the attempted murder and felonious assault convictions. R.C. 2903.02(A), which prohibits murder, states that "[n]o person shall purposely cause the death of another * * *." The attempt statute, R.C. 2923.02(A), states that "[n]o person, purposely or knowingly * * * shall engage in conduct that, if successful, would constitute or result in the offense." With regard to felonious assault, R.C. 2901.11(A)(1) and (2) provide that "[n]o personal

shall knowingly * * * cause serious physical harm to another * * * or cause or attempt to cause physical harm to another * * * by means of a deadly weapon."

{¶33} Campbell asserts that there was no evidence that he knowingly attempted to purposely cause anyone's death, knowingly caused physical harm to anyone, or knowingly caused physical harm by means of a deadly weapon. As support, he argues that no one was arrested on September 14, 2011, no firearm was recovered that day, neither the shell casings nor the bullet were tested for DNA or fingerprints, and no one saw him with a gun that night. Campbell's arguments are relevant to whether there was sufficient evidence that he was shooter, but not to whether he acted knowingly when he shot Williams and Malone.

{¶34} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." A person acts "knowingly" to purposely cause another's death or to cause serious physical harm when they point a gun at someone and pull the trigger. The evidence was sufficient to demonstrate that Campbell purposely shot Williams in the stomach and Malone in the back; hence, there was sufficient evidence that he acted knowingly.

**{¶35}** Finally, Campbell argues that the state did not offer sufficient evidence to support the firearm specifications, because "there was no evidence that [he] possessed a weapon." This argument is also without merit.

**{¶36}** The state presented sufficient evidence that Williams and Malone were shot at the Olive Twist on September 14, 2011. Sims identified a male in a plaid shirt from the video as the individual he saw pull a gun from his waistband, pull the trigger, and shoot Williams. Jackson identified Campbell in court as the male in the plaid shirt on the video. Then, on December 2, 2011, after a high-speed police chase, a gun that matched the shell casings found on the dance floor and in the parking lot of the Olive Twist on September 14, 2011, was recovered from the vehicle in which Campbell had been riding. Viewing this evidence in a light most favorable to the prosecution, we find that the state presented sufficient evidence that Campbell possessed and used a firearm in the commission of these offenses. The second assignment of error is overruled.

C.     Manifest Weight of the Evidence

**{¶37}** In his third assignment of error, Campbell asserts that his convictions were against the manifest weight of the evidence.

**{¶38}** "A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion." *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356

(1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inference, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Penque*, 8th Dist. Cuyahoga No. 99209, 2013-Ohio-4696, ¶ 49. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial is reserved for only those "exceptional cases in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

**{¶39}** Campbell asserts that his convictions are against the manifest weight of the evidence because "the quality of the evidence against [him] was poor and unreliable." Specifically, he contends that Sims (1) never said that the male he identified on the video as the shooter was Campbell; (2) never identified Campbell from a photo array; and (3) did not identify Campbell in court as the shooter. He argues further that no one saw him with a gun on September 14, 2011, there was no forensic evidence that tied him to the shooting, and the state did not prove beyond a reasonable doubt that he possessed the gun found in the flipped vehicle after the high-speed police chase.

**{¶40}** Despite Campbell's arguments, this is not the exceptional case where the evidence weighs heavily against the conviction. Considering the totality of the evidence,

it is apparent that the state's witnesses identified Campbell as the shooter, and that the gun found in the flipped vehicle on December 2, 2011, belonged to him. The jury did not lose its way or create a miscarriage of justice such that a new trial must be ordered. The third assignment of error is overruled.

D.     Cross-Examination of Officer Coyne

{¶41}   Officer Coyne testified that he prepared a police report after the high-speed chase on December 2, 2011.   He included a statement in the report that suggested that the male who Howell recognized as the shooter from September 14, 2011, and who tried to re-enter the Olive Twist on December 2, 2011, was named "Roderick."   On cross-examination, defense counsel asked Officer Coyne who told him the name of the shooter.   When the state objected that defense counsel was trying to elicit hearsay, counsel argued that the police report was a business record subject to the business records exception for hearsay found in Evid.R. 803(6).   The trial court sustained the state's objection, finding that the report was inadmissible hearsay.

{¶42}   In his fourth assignment of error, Campbell argues that his due process rights were violated when the trial court sustained the state's objection and did not allow cross-examination on this issue.

{¶43}   The admission or exclusion of evidence at trial falls within the sound discretion of the trial court.   Evid.R. 104; *State v. Heinish*, 50 Ohio St.3d 231, 553

N.E.2d 1026 (1990). A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶44}** Hearsay is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Generally, hearsay statements are inadmissible at trial unless the statement comes in under a recognized exception. Campbell argues that he should have been allowed to cross-examine Officer Coyne about his source for the information contained in the report under the business records exception for hearsay contained in Evid.R. 803(6) and the public records exception contained in Evid.R. 803(8).

**{¶45}** Campbell raised no issue regarding Evid.R. 803(8) in the trial court and, accordingly, has waived this issue on appeal.[1] With respect to Evid.R. 803(6), "a police report is not admissible under the business-records exception in Evid.R. 803(6) if the report recites hearsay statements received by the officer from others." *State v. Daniel*, 2d Dist. Montgomery No. 24151, 2011-Ohio-2821, ¶ 15, citing *Randle v. Gordon*, 8th Dist.

---

[1]Defense counsel also never laid a proper foundation for admission of the report under this hearsay exception. Evid.R. 803(8) excludes as hearsay "records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth * * * matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant * * *." Defense counsel questioned Officer Coyne to establish that he prepared the report but never established that the police report was generated pursuant to any duty imposed by law. *See State v. Morgan*, 8th Dist. Cuyahoga No. 97934, 2012-Ohio-4937, ¶ 17.

Cuyahoga No. 52961, 1987 Ohio App LEXIS 9432 (Oct. 29, 1987). It is apparent that the statement in the police report about the shooter's name was based on hearsay statements from a third party and thus was inadmissible. Furthermore, despite Campbell's assertion otherwise, it is obvious that counsel was trying to elicit the testimony for the truth of the matter asserted, i.e., that someone named Roderick was the shooter. Accordingly, the trial court did not abuse its discretion nor violate Campbell's due process rights in prohibiting defense counsel's cross-examination of Officer Coyne about the statement or its source. The fourth assignment of error is overruled.

E. The State's Use of Surveillance Video at Trial

{¶46} During Sims's testimony, the state introduced and played for the jury a portion of the September 14, 2011 surveillance videotape the police had downloaded from the Olive Twist. Defense counsel made no objection to the tape. The state also played a portion of the tape for the jury during Jackson's testimony. This time, defense counsel objected that it was unduly suggestive and prejudicial to play only a portion of the tape for the jury and argued that the entire tape should be played. Later, on redirect examination of Detective Houser, the state played the entire tape for the jury, without objection by defense counsel.

{¶47} In his fifth assignment of error, Campbell argues that it was unduly suggestive to allow the state to introduce and play portions of the videotape during Sims's

and Jackson's testimony.   He contends that by playing only a portion of the tape, the state was suggesting that the person who committed the crime would necessarily appear in that part of the tape.

{¶48}   The trial court did not abuse its discretion by allowing the state to play portions of the surveillance tape for the jury during Sims's and Jackson's testimony. Both Sims and Jackson had previously identified an individual from those portions of the videotape, and Jackson testified before being shown the tape that he would be able to identify that individual again from the tape, even though he had not seen the tape again since the night of the shooting.   Furthermore, the portions of the tape that were shown to the jury were the portions that the police had downloaded from the Olive Twist camera system based on Sims and Jackson's identifications.

{¶49} Campbell also contends that it was error to play the entire downloaded tape to the jury during redirect examination of Detective Houser because it exceeded the scope of redirect.   Defense counsel made no objection to showing the jury the entire downloaded tape, however, and thus has waived this issue on appeal.   The fifth assignment of error is therefore overruled.

F.      Jury Instruction on Constructive Possession

{¶50}   R.C. 2925.01(K) defines possession as "having control over a thing or substance."   Possession can be actual or constructive.   *State v. Brown*, 8th Dist.

Cuyahoga No. 87932, 2007-Ohio-527. Actual possession entails ownership or physical control, whereas constructive possession exists when an individual knowingly exercised dominion and control over an object, even though the object may not be within his or her immediate physical possession. *Id.*; *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982).

{¶51} In his sixth assignment of error, Campbell contends that the trial court erred in instructing the jury on constructive possession relative to Count 10, improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B). Campbell asserts that the evidence did not warrant a constructive possession charge relative to this count because the state's accident reconstruction expert testified that it was impossible to determine where the guns that were recovered from the flipped vehicle were located prior to the accident. Because there were three men in the vehicle, any of whom could have possessed the guns, no one saw him with a gun, and there was no forensic evidence linking him to the gun, Campbell argues that the trial court abused its discretion in instructing the jury on constructive possession regarding Count 10.

{¶52} Our review of the record, however, demonstrates that the trial court instructed the jury on constructive possession relative to the firearm specifications associated with Counts 1 and 2 (attempted murder) and Counts 3 through 6 (felonious assault). The court did not instruct the jury on constructive possession

regarding Count 10. Because the court did not give a constructive possession instruction regarding Count 10, Campbell's assignment of error is without merit. Moreover, even if the court erred in giving an instruction on constructive possession relative to the firearms specifications associated with the attempted murder and felonious assault charges, we find the error was harmless because the evidence established beyond a reasonable doubt that Campbell had actual possession of a gun on September 14, 2011, when he shot Williams and Malone. The sixth assignment of error is therefore overruled. G.     Jail-Time Credit

**{¶53}** Last, Campbell argues that the trial court failed to credit him with jail-time credit. Although the trial court ordered at sentencing that Campbell would be credited with 363 days, no such credit appears by any judgment in the record. The case is remanded with instructions to the trial court to issue a nunc pro tunc sentencing entry crediting Campbell with 363 days jail-time credit. The seventh assignment of error is sustained.

**{¶54}** Convictions affirmed; remanded for nunc pro tunc sentencing entry.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.


A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.



KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., P.J., and
SEAN C. GALLAGHER, J., CONCUR