[Cite as *State v. Scullin*, 2019-Ohio-3186.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                           :

JEFFREY W. SCULLIN, JR.,                :

    Defendant-Appellant.         :

No. 107866

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-622929-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, L.L.C., Joseph C. Patituce, and Megan Patituce, *for appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, Jeffrey Scullin, Jr., brings the instant appeal challenging his convictions for aggravated murder, murder, felonious assault, tampering with evidence, making false alarms, and endangering children.

Specifically, appellant argues that the trial court erred in denying his motion to suppress and motion to compel discovery. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} The instant matter arose from the murder of Melinda Pleskovic (hereinafter "victim") on October 23, 2017, at her residence in Strongsville, Ohio. The victim was a 49-year-old school teacher.

{¶ 3} On October 23, 2017, police were dispatched to the victim's residence regarding a possible stabbing. Upon arriving at the home, officers found the victim laying on the kitchen floor. The victim was unresponsive and bleeding profusely. She had sustained approximately 35 stab wounds and two gunshot wounds. The victim was transported to Southwest General Hospital where she was pronounced dead at approximately 9:00 p.m. (Tr. 156.)

{¶ 4} The responding officers also encountered the victim's husband Bruce Pleskovic, the victim's son,[1] and appellant at the residence. Appellant was engaged to the victim's daughter, and he was living in the basement of the victim's home at the time of the murder. Officers spoke with the victim's husband and appellant at the scene. Furthermore, officers obtained and executed search warrants for the residence, three vehicles that were parked in the driveway when officers arrived on scene, and cell phones belonging to the victim, her husband, and appellant.

---

[1] The victim's son has Down syndrome.

{¶ 5} The following day, officers searched one of the vehicles that was parked in the driveway, a Chevrolet Silverado truck, that appellant had been driving at the time of the incident. Officers discovered a knife inside the truck that had "some red staining" on the blade. (Tr. 101.) Preliminary testing of the red substance confirmed that it was human blood.

{¶ 6} The knife was submitted to the medical examiner's office for DNA analysis. DNA testing revealed that the victim's DNA was present on the knife's blade and handle, and appellant's DNA was present on the knife's handle. After receiving the results of the DNA testing, officers obtained a warrant for appellant's arrest.

{¶ 7} On October 31, 2017, after obtaining the DNA testing results and a warrant for appellant's arrest, officers asked appellant to come to the Strongsville Police Department. Appellant was initially interviewed by Strongsville Police Detective Ron Stolz. During this interview, appellant was placed under arrest.

{¶ 8} Subsequently, Lance Fragomeli, an FBI special agent and polygraph examiner, interviewed appellant and also administered a polygraph examination. After taking the polygraph examination, appellant ultimately confessed to stabbing and shooting the victim. Appellant informed the police that he put the gun with which he shot the victim in a Buick LeSabre, and that the vehicle was parked in the driveway of his parents' house. Appellant provided officers with consent to search the LeSabre.

{¶ 9} Officers searched the LeSabre and recovered a .357 revolver and a pair of sweatpants containing blood stains inside. Ballistic testing confirmed that the victim had been shot by the .357 revolver that was recovered from the LeSabre. DNA testing of the revolver indicated that appellant's DNA was on the handle, barrel, and trigger of the gun. Furthermore, DNA testing of the sweatpants recovered from the LeSabre indicated that appellant's DNA was present on the waistband and the blood stains on the pants were the victim's blood. (Tr. 232.)

{¶ 10} On November 8, 2017, the Cuyahoga County Grand Jury returned a seven-count indictment against appellant charging him with (1) aggravated murder, in violation of R.C. 2903.01(A); (2) murder, in violation of R.C. 2903.02(B); (3) felonious assault, in violation of R.C. 2903.11(A)(1); (4) felonious assault, in violation of R.C. 2903.11(A)(2); (5) tampering with evidence, in violation of R.C. 2921.12(A)(1), with a forfeiture specification; (6) making false alarms, in violation of R.C. 2917.32(A)(3); and (7) endangering children, in violation of R.C. 2919.22(A). Counts 1 through 4 contained one- and three-year firearm specifications. Appellant was arraigned on November 14, 2017. He pled not guilty to the indictment.

{¶ 11} On December 19, 2017, appellant filed a motion for leave to file a suppression motion after the exchange of discovery. The trial court granted the motion on December 20, 2017, ordering defense counsel to file a motion to suppress within 30 days of the exchange of discovery.

{¶ 12} On August 16, 2018, appellant filed a motion to compel discovery. Therein, appellant sought an order compelling the state to turn over any and all

evidence related to the polygraph examination that was administered to appellant on October 31, 2017.

{¶ 13} The state filed a brief in opposition to appellant's motion to compel on August 27, 2018. Therein, the state argued that the results of the polygraph examination were not subject to discovery under Crim.R. 16. The trial court denied appellant's motion to compel on August 28, 2018.

{¶ 14} In addition to the motion to compel, appellant filed a motion to suppress on August 16, 2018. Appellant filed a supplemental motion to suppress on August 22, 2018.

{¶ 15} In his motions to suppress, appellant requested an order suppressing the following evidence: (1) the evidence obtained from the search of appellant's Chevrolet Silverado truck, which was parked in the driveway of the victim's residence on the night of the murder (knife), (2) the evidence obtained from the search of appellant's cell phone and phone records, (3) the statements appellant made to police, and (4) the evidence obtained from the search of the Buick LeSabre, which was parked in the driveway of appellant's parents' house (.357 revolver and sweatpants containing blood stains). With the exception of the LeSabre, all of these searches were conducted pursuant to a search warrant. After appellant admitted to stabbing and shooting the victim during Special Agent Fragomeli's October 31, 2017 interview, appellant provided officers with consent to search the LeSabre. (Tr. 203.)

{¶ 16} On August 27, 2018, the state filed a motion for an extension of time to respond to appellant's suppression motion. The trial court granted the motion

for an extension of time. The state filed its brief in opposition to appellant's motion to suppress on September 18, 2018.

{¶ 17} The trial court held a hearing on October 12, 2018. The state placed the terms of a plea agreement on the record that had been offered to appellant. Defense counsel indicated that appellant rejected the plea offer. The trial court proceeded to hold a hearing on appellant's motion to suppress.

{¶ 18} The following six witnesses testified during the suppression hearing: (1) Dr. Nasir Butt, DNA technical manager and supervisor with the Cuyahoga County Regional Forensic Science Laboratories; (2) Strongsville Police Officer Patrick O'Sullivan; (3) Strongsville Police Sergeant Steven Piorkowski; (4) Strongsville Police Detective Steve Borowske; (5) Detective Stolz; and (6) Special Agent Fragomeli.

{¶ 19} The suppression hearing concluded on October 16, 2018. After considering the parties' arguments and the testimony adduced during the hearing, the trial court denied appellant's motion to suppress.

{¶ 20} On October 17, 2018, appellant withdrew his not guilty plea and entered a plea of no contest to the seven offenses charged in the indictment. Based on the evidence proffered, the trial court found appellant guilty on all seven counts and the underlying specifications. The trial court ordered a presentence investigation report and set the matter for sentencing.

{¶ 21} On October 29, 2018, the trial court held a sentencing hearing. The trial court determined that Counts 1 through 4 merged for sentencing purposes. The

state elected to sentence appellant on Count 1. The trial court also merged the underlying firearm specifications and elected to sentence appellant on the three-year firearm specification. The trial court imposed an aggregate prison sentence of life with the possibility of parole after 33 years: life in prison on Count 1, consecutive to the three-year firearm specification; three years on Count 5 to be served concurrently with Count 1; 180 days in jail on both Count 6 and Count 7, to be served concurrently with Count 1.

{¶ 22} On November 2, 2018, appellant filed the instant appeal challenging the trial court's judgment. He assigns four errors for review:

I. The trial court erred in improperly shifting the burden from the state to the defense in ruling that the defense did not prove misconduct.

II. The trial court erred in denying appellant's motion to compel because the evidence sought was material to the defense and relied upon by the state of Ohio.

III. The trial court erred in denying appellant's motion to suppress because no reasonable person would have believed that the consent to search exceeded beyond the brief period necessary to remove a diaper bag.

IV. The trial court erred in finding the search warrants for appellant's cell phone and cellular data were supported by probable cause and included particularized descriptions.

{¶ 23} For ease of discussion, appellant's assignments of error will be addressed out of order.

## II. Law and Analysis

### A. Motion to Suppress

{¶ 24} Appellant's first, third, and fourth assignments of error pertain to the trial court's ruling denying his motion to suppress.

### 1. Standard of Review

{¶ 25} This court reviews a trial court's ruling on a motion to suppress under a mixed standard of review.

> "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. With respect to the trial court's conclusion of law, the reviewing court applies a de novo standard of review and decides whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*State v. Miller*, 8th Dist. Cuyahoga No. 106946, 2018-Ohio-4898, ¶ 22.

### 2. Confession

{¶ 26} In his first assignment of error, appellant argues that the trial court erred in denying his motion to suppress with respect to the statements he made to the police. Specifically, appellant argues that the trial court erred in finding that (1) Detective Stolz's initial interrogation on October 31 was noncustodial in nature, and thus, *Miranda* warnings were not required, and (2) appellant's statements were not coerced and voluntarily made.

### a. Detective Stolz's Initial Interview

{¶ 27} First, appellant challenges the trial court's finding that Detective Stolz's initial interrogation on October 31 was noncustodial in nature and thus *Miranda* warnings were not required.

> Prior to a custodial interrogation, the accused must be apprised of his or her right against self-incrimination and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* defines "custodial interrogation" as any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

*Cleveland v. Oles*, 2016-Ohio-23, 45 N.E.3d 1061, ¶ 13 (8th Dist.).

{¶ 28} During the suppression hearing, Detective Stolz testified that on the morning of October 31, 2017, he received the results of the DNA testing from Dr. Butt. The results indicated that the victim's DNA was present on the blade and the handle of the knife that was found in appellant's pickup truck, and appellant's DNA was present on the knife's handle. After receiving the testing results, police obtained an arrest warrant for appellant.

{¶ 29} After obtaining a warrant for appellant's arrest, Detective Stolz contacted appellant around 10:30 a.m. and asked him to come to the police station. Appellant arrived at the police station around noon, and Detective Stolz brought him into the interview room in the police station's detective bureau.

{¶ 30} Detective Stolz explained that appellant had previously came into the police station, on his own free will, earlier that week on October 24 and 26, 2017. When appellant came into the station on the 24th and the 26th, he was not under arrest or detained in any way, and he was free to leave at any time. Detective Stolz

interviewed appellant on the 24th and 26th in the same interview room in the detective bureau.

{¶ 31} During the interview on October 31, Detective Stolz testified that when appellant was initially brought inside the interview room, he was not placed under arrest or handcuffed. However, he explained that unlike the previous interviews on October 24 and 26, if appellant attempted to terminate the interview and leave the police station during the October 31 interview, he would have been placed under arrest.

{¶ 32} During the October 31 interview, before appellant was advised of his *Miranda* rights, Detective Stolz began going over appellant's previous statements about his whereabouts on the day of the murder. The officers were asking appellant the same questions they had previously asked him: "[s]imple, open-ended questions; who, what, where, why. We went over ascertaining change [in appellant's responses]." (Tr. 245.) Detective Stolz asserted that he was asking appellant "to corroborate where he was [on October 23, 2017], not specific questions about the murder itself." (Tr. 246.) He confirmed that during this initial interview, he was not asking appellant whether he murdered the victim or the location of any weapons that had been used.

{¶ 33} Approximately 20 minutes into the interview, Detective Stolz began confronting appellant with information and evidence that contradicted appellant's statements. After he confronted appellant with the evidence that he received from

Dr. Butt, Detective Stolz placed appellant under arrest and advised appellant of his *Miranda* rights.

{¶ 34} After reviewing the record, we find no merit to appellant's argument regarding Detective Stolz's initial interview. Appellant did not confess during Detective Stolz's initial interview, nor during the post-arrest phase of Detective Stolz's interview. Appellant denied any wrongdoing during Detective Stolz's interview, and did not confess to stabbing and shooting the victim until much later in the day during Special Agent Fragomeli's post-polygraph interview.

{¶ 35} Assuming, arguendo, that the trial court erred in finding that Detective Stolz's initial interview was noncustodial in nature, any error in this regard would be harmless. *See State v. Nelson*, 2017-Ohio-5568, 93 N.E.3d 472, ¶ 72 (8th Dist.). "Harmless error is an error that does 'not affect substantial rights.' Crim.R. 52(A). The harmless error standard asks whether the rights affected are substantial and, if so, whether a defendant has suffered any prejudice as a result. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36." *State v. Lindsey*, 8th Dist. Cuyahoga No. 106111, 2019-Ohio-782, ¶ 88; *see also State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, ¶ 172 (8th Dist.), citing *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976) (applying harmless error doctrine to a purported *Miranda* violation).

{¶ 36} In this case, appellant did not make any incriminating statements during the initial interview with Detective Stolz, nor did he confess to having any involvement in the murder. Even after Detective Stolz arrested appellant and

advised appellant of his *Miranda* rights, appellant repeatedly insisted that he did not do anything wrong, that the victim took him in and was like a mother to him, and that he would not hurt anyone.

{¶ 37} For all of these reasons, we find no merit to appellant's argument that the trial court erred in concluding that the initial interview conducted by Detective Stolz was not a "custodial interrogation" implicating *Miranda*. Appellant's first assignment of error is overruled in this respect.

### b. Police Misconduct

{¶ 38} Second, appellant argues that he did not voluntarily waive his *Miranda* rights and that his confession was coerced. In support of this argument, appellant asserts that (1) Detective Stolz manipulated him using his infant daughter; (2) Special Agent Fragomeli psychologically coerced him using his infant daughter, and manipulated appellant into compiling an apology letter addressed to his daughter; and (3) Detective Stolz repeatedly threatened him with the death penalty and threatened to charge him with a crime that does not exist in the state of Ohio.

{¶ 39} In denying appellant's motion to suppress, the trial court concluded that (1) appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights and spoke to the police, and (2) appellant's statements were voluntarily made and not the result of coercion or police misconduct. The trial court emphasized that officers read appellant his *Miranda* rights multiple times, including when he was in custody, and each time, appellant voluntarily spoke with the officers and never indicated he did not understand the *Miranda* rights. The trial court also

emphasized that appellant did not attempt to invoke his *Miranda* rights or his right to counsel at any time, nor did he attempt to stop the interviews in any way.

{¶ 40} In support of these findings, the trial court explained that (1) throughout the process of interrogating appellant on October 31, 2017, officers provided food and water to appellant; (2) when appellant complained of a headache, the officers provided aspirin to him; (3) the officers took several breaks and gave appellant "more time" when he asked for it (rather than continuously interrogating him); and (4) officers made sure appellant was comfortable, and they accommodated appellant when he said his handcuffs were too tight. Regarding Detective Stolz's reference to the death penalty, the trial court concluded that it was not an "illusory promise" and that the death penalty was a possibility at the time.

### i. Apology Letter

{¶ 41} Regarding Special Agent Fragomeli's suggestion that appellant write an apology letter to his daughter, Special Agent Fragomeli testified during the suppression hearing that he — not appellant — started writing the apology letter during the pre-polygraph interview. Special Agent Fragomeli explained the purpose for his suggestion that appellant write the letter:

> During our conversation I asked [appellant], I said, Hey, look. I'd like you to consider doing an apology letter to your daughter. And the reason is you can let her know the entire truth [about the October 23, 2017 incident]. If it is not a premeditated murder, if it is something else you're embarrassed or afraid about, you can let her know right now. And then years down the road when she can read and write, and she's in school, people on the Internet will not use this situation to bully her, to traumatize her. And that's why I asked him to write that apology letter.

(Tr. 214-215.)

{¶ 42} In support of his argument that Special Agent Fragomeli improperly suggested that appellant write an apology letter to his daughter, appellant directs this court to *State v. Bohanon*, 8th Dist. Cuyahoga No. 89443, 2008-Ohio-1087. In *Bohanon*, the defendant-appellee filed a motion to suppress oral and written statements she had made to police. During one interview, a detective suggested that the defendant write an apology letter to her aunt. Following the detective's suggestion, the defendant wrote an apology letter to her aunt in which she confessed to the theft offense with which she was charged. The state introduced a copy of the defendant's apology letter into evidence. The trial court granted the defendant's motion to suppress the statements she made to police, concluding that the defendant's admission to the theft offense and written apology were not voluntarily made.

{¶ 43} On appeal, this court affirmed the trial court's judgment suppressing the defendant's statements. Initially, this court noted that in 1988, the First District found that it was "suspect" to ask the subject of an interrogation to draft an apology letter. *Id.* at ¶ 12, citing *State v. MacDonald*, 1st Dist. Hamilton No. C-860833, 1988 Ohio App. LEXIS 229, 6-7 (Jan. 13, 1988). This court found "subtle inducement" in the detective's suggestion that the defendant write an apology letter to her aunt. *Id.* at ¶ 11. The court went on to conclude, "the inducement inherent in the officer's suggestion that [the defendant] write her aunt a letter of apology, *combined with*

[*the defendant's*] *limited intelligence and psychological conditions*, rendered her confession in this case involuntary." (Emphasis added.) *Id.* at ¶ 12.

{¶ 44} After reviewing the record, we find this case to be distinguishable from *Bohanon*. First, in *Bohanon*, the defendant was initially found to be incompetent to stand trial.[2] *Id.* at ¶ 2.

> [The defendant] was found to be mildly mentally retarded, with a documented IQ testing of 66. She also suffered from a psychotic disorder and was taking two anti-psychotic drugs. She was unable to understand the nature and objective of the legal proceedings and to assist her attorney at that time. The report establishing her restoration to competency diagnosed [the defendant] as suffering from bipolar disorder and borderline intellectual functioning.

*Id.* at ¶ 7.

{¶ 45} In this case, unlike *Bohanon*, appellant's competency was not called into question, nor was appellant found to be incompetent at any point. *See MacDonald* at 6 (although questions existed regarding the literacy of the defendant, "there was no allegation that his mentality was subnormal."). Furthermore, there is no evidence in the record that appellant has limited intelligence, any mental diseases or defects, or that he was under the influence of alcohol, drugs, or medications at the time of Special Agent Fragomeli's interview.

{¶ 46} Second, unlike *Bohanon*, appellant did not draft, sign, or assent to the apology letter. Special Agent Fragomeli testified that the letter contained his words, not appellant's words, and he compiled the letter using a "reflective listening"

---

[2] The defendant was later restored to competency.

technique. (Tr. 215.) Special Agent Fragomeli drafted the letter based on his understanding of what appellant communicated to him during the interview. Finally, Special Agent Fragomeli confirmed that the document he compiled during the interview was not, in fact, a letter because "it was never fulfilled. It was never verified. It was never signed [by appellant]. * * * It is just notes." (Tr. 216.)

{¶ 47} Third, unlike *Bohanon*, in which the defendant confessed to the theft offense with which she was charged in the apology letter, appellant did not confess to the murder during the pre-polygraph interview during which Special Agent Fragomeli suggested that he write the letter. Appellant also denied any wrongdoing during the polygraph examination and during the early stages of the post-polygraph interview.

{¶ 48} Based on the foregoing analysis, we are unable to find that any inducement inherent in Special Agent Fragomeli's suggestion that appellant write an apology letter to his daughter rendered appellant's subsequent confession involuntary. Accordingly, appellant's first assignment of error is overruled in this respect.

### ii. Death Penalty

{¶ 49} Appellant further argues that his confession was coerced because the police repeatedly threatened him with the death penalty.

{¶ 50} During the suppression hearing, Detective Stolz acknowledged that during the October 31, 2017 interview, he asked appellant whether he wanted to see his daughter again, and he told appellant that he would not get any "breaks" at the

sentencing hearing. (Tr. 248.) Detective Stolz asserted that he asked appellant if he knew the difference between premeditated murder and aggravated murder. (Tr. 249.) Furthermore, Detective Stolz advised appellant that the police would pursue the charge of premeditated murder. (Tr. 250.)

{¶ 51} Detective Stolz acknowledged during the suppression hearing, however, that (1) premeditated murder and aggravated murder are "the same thing," (2) the crime of premeditated murder does not exist, and (3) he mistakenly referenced the crime of premeditated murder and/or suggested that there was a difference between premeditated murder and aggravated murder during the interview.

{¶ 52} Defense counsel asked Detective Stolz on cross-examination if he threatened appellant with the death penalty or told appellant that he was "not going to be around very long" during the October 31, 2017 interview. (Tr. 251-252.) Detective Stolz testified that he "asked [appellant] if he knew what could happen [regarding sentencing]." (Tr. 252.) Detective Stolz confirmed, "I didn't threaten [the death penalty]. I asked [appellant] simply did he know that [the death penalty] was definitely a possibility." (Tr. 252.)

{¶ 53} The trial court rejected the defense's theory that appellant's confession was coerced by the references to the death penalty during the October 31, 2017 interrogation. The trial court explained that it "was not an illusory promise when Detective Stolz told [appellant] that he faced the possibility of the death penalty, and there was nothing improper or coercive about that." (Tr. 278.)

{¶ 54} In support of his argument that his confession was coerced by Detective Stolz's threats regarding the death penalty, appellant directs this court to *State v. Kerby*, 2d Dist. Clark No. 03-CA-55, 2007-Ohio-187. In *Kerby*, the defendant confessed to his involvement in a murder and attempted robbery. The defendant filed a motion to suppress his confession, which the trial court denied.

{¶ 55} On appeal, the defendant argued, in relevant part, that "his confession was involuntary because it was obtained through the use of coercion and deception, along with tactics inducing fright and despair." *Id.* at ¶ 19. The Second District concluded that the trial court erred in denying the motion to suppress because "the evidence fails to demonstrate that [the defendant's] confession was voluntary." *Id.* at ¶ 21. In support of its holding, the court explained that the officers' suggestion that the defendant could face the death penalty was "deceptively misleading and a misstatement of the law" which undermined the defendant's ability to voluntarily waive his Fifth Amendment privilege against self-incrimination. *Id.* at ¶ 84-86. The Second District emphasized that at the time of the interview, the interrogating officers were aware of the defendant's age, 17 years old, which eliminated the possibility of the death penalty. Nevertheless, the officers "attempted to create the impression that [the defendant] could be facing a death sentence unless he cooperated with them and confessed." *Id.* at ¶ 87. For all of these reasons, the court concluded that the misstatement about the death penalty

> deprived [the defendant] of his capacity to intelligently and voluntarily waive his Fifth Amendment rights. When considering the totality of the surrounding circumstances, these factors outweigh the influence of

[the defendant's] maturity and the overall short duration of the interrogation. Thus, we find that the trial court erred in determining that [the defendant's] confession to the police was voluntary.

*Id.* at ¶ 87.

{¶ 56} After reviewing the record, we find this case to be distinguishable from *Kerby*. First, unlike *Kerby*, the death penalty was not statutorily precluded based on appellant's age. Second, unlike *Kerby*, Detective Stolz did not deliberately mislead appellant or misstate the law regarding the possible penalties appellant could face. Pursuant to R.C. 2929.03(D)(1), the death penalty is a possible sentence for the offense of aggravated murder. Although Detective Stolz acknowledged that he made a misstatement of the law during the interview, the misstatement pertained to his reference of premeditated murder and to the extent that he implied that there was a difference between premeditated and aggravated murder. Detective Stolz's misstatement of law did not pertain to the possible penalties that appellant could face.

{¶ 57} Third, unlike *Kerby*, Detective Stolz did not definitively know whether appellant would be charged with any death penalty specifications. At the time of the October 31, 2017 interview, the case had not been presented to the grand jury. As such, Detective Stolz had no way of knowing whether the state would pursue and whether the grand jury would charge appellant with any death penalty specifications pursuant to R.C. 2929.04(A)(1)-(10).

{¶ 58} "An interrogator may inform the suspect of the penalties for the offense of which he is suspected." *State v. Bays*, 87 Ohio St.3d 15, 23, 716 N.E.2d

1126 (1999), citing *State v. Arrington*, 14 Ohio App.3d 111, 115, 470 N.E.2d 211 (6th Dist.1984), *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978), and *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir.1983). In *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245 (2d Dist.), the Second District held that the interrogating detectives' repeated references to the death penalty were not improper because, based on the facts of the case, the detectives reasonably suspected that the defendant committed the offense of aggravated murder with prior calculation and design. *Id.* at ¶ 44. Accordingly, the court held that the detectives "did not overstate the potential charges against [the defendant], and they did not misstate the law in telling [the defendant] that he faced a possible death sentence if he were charged with premeditated murder." *Id.*

{¶ 59} Similarly, in the instant matter, Detective Stolz was permitted to inform appellant about the penalties for the offenses he was suspected of committing. The investigators reasonably suspected that appellant committed the crime of aggravated murder with prior calculation and design, for which one possible sentence is the death penalty. Furthermore, appellant did not confess to the murder during the interview with Detective Stolz. As noted above, appellant continued to deny any wrongdoing during the interview with Detective Stolz, the pre-polygraph interview, polygraph examination, and the initial stages of the post-polygraph interview with Special Agent Fragomeli.

{¶ 60} Finally, the record reflects that appellant raised the issue of death penalty prior to the October 31, 2017 interrogations. During the suppression

hearing, Detective Stolz testified, "prior to [the October 31 interview] in a different interview I asked [appellant] what should happen to the person that is responsible for this crime, and *he had offered the death penalty*." (Emphasis added.) (Tr. 253.) Accordingly, before Detective Stolz referenced the death penalty on October 31, 2017, appellant had an independent and subjective belief that the perpetrator could be sentenced to death.

{¶ 61} Based on the foregoing analysis, we are unable to conclude that Detective Stolz improperly referenced the death penalty during the October 31, 2017 interview, or that these references rendered appellant's subsequent confession involuntary. Accordingly, appellant's first assignment of error is overruled in this respect.

### iii. Burden

{¶ 62} Finally, appellant argues that the trial court "engaged in unconstitutional burden shifting" and "erred in improperly shifting the burden from the state to the defense in ruling that the defense did not prove [police] misconduct." Appellant's brief at 4.

{¶ 63} Typically, if a defendant "challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of the evidence." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34. Appellant appears to argue that the trial court improperly shifted the burden from the state (to prove that the confession was voluntary and that appellant

knowingly, intelligently, and voluntarily waived his *Miranda* rights) to the defense to establish the existence of police misconduct or coercion.

{¶ 64} The state directs this court to R.C. 2933.81(B), which became effective in July 2010. In *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, this court recognized that pursuant to R.C. 2933.81(B), when an interrogation is recorded electronically, as was the case here, a defendant's statements during the recorded interrogation are presumed to be voluntary. *Id.* at ¶ 80. Furthermore, this court explained that the statute places the burden on appellant to demonstrate that the recorded statement or confession was involuntary. *Id.*

{¶ 65} In the instant matter, we initially note that it is undisputed that there was a period of time, approximately two to three hours, during which the camera was turned off during the interviews on October 31, 2017. Appellant relies on this two-to-three-hour gap in the video recording in support of his argument that his confession was coerced. *See* appellant's brief at 9 ("[Special] Agent Fragomeli began interrogating [a]ppellant only after the cameras were turned off.").

{¶ 66} Special Agent Fragomeli testified during the suppression hearing that after executing consent and waiver forms regarding the polygraph examination, he conducted a pre-polygraph interview with appellant. The pre-polygraph interview was not recorded. (Tr. 191.) Special Agent Fragomeli explained what he discussed with appellant during the pre-polygraph interview: "I asked him to tell me basically why he's here, and just to make sure we're on the same page. Then I asked him to go through his day on October 23rd to the best of his recollection." (Tr. 191.) Special

Agent Fragomeli testified that appellant denied any wrongdoing or involvement in the murder during the pre-polygraph interview: "[appellant] told me that he did not have any involvement with the injuries to [the victim] in any matter. That was it." (Tr. 195.)

{¶ 67} The post-polygraph interview, during which appellant confessed, was electronically recorded. Furthermore, the entire interview conducted by Detective Stolz was electronically recorded. As appellant acknowledges, "[t]he trial court had the opportunity to review each of the recorded interviews, and relied upon them heavily in reaching its decision." Appellant's brief at 9.

{¶ 68} Because appellant's statements and confession were recorded electronically, the trial court did not err in shifting the burden from the state to the defense to prove coercion. Furthermore, after reviewing the record, and based on the totality of the circumstances in this case, we find that the evidence supports the trial court's findings that (1) appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights, and (2) appellant failed to meet his burden of establishing police misconduct or coercion. Accordingly, appellant's first assignment of error is overruled in this respect.

{¶ 69} For all of the foregoing reasons, we overrule appellant's first assignment of error. After reviewing the record, and based upon the totality of the circumstances, we are unable to conclude that appellant's statements were made involuntarily or that his will was overborne.

For purposes of evaluating the voluntariness of a confession, the "totality of the circumstances" includes: "'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 54, quoting *State v. Mason*, 82 Ohio St.3d 144, 154, 694 N.E.2d 932 (1998).

*State v. Martinez*, 8th Dist. Cuyahoga Nos. 103572 and 103573, 2016-Ohio-5515, ¶ 33.

{¶ 70} This court will not conclude that appellant's *Miranda* waiver was involuntary "unless there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." *Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35; *see also State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001) (finding that a reviewing court need not assess the totality of the circumstances unless the court finds that the tactics used by the detectives were coercive).

{¶ 71} Appellant was 21 years old when he was interviewed on October 31, 2017. Although appellant did not obtain his high school diploma, he obtained an HVAC certificate and was employed. During the change-of-plea hearing, appellant confirmed that he is able to read and write. (Tr. 332.)

{¶ 72} Although appellant asserts that he "suffer[s] from educational deficiencies," there is no evidence in the record indicating that he has mental or intellectual deficiencies or defects. Appellant's brief at 14. There is no indication that appellant was under the influence of drugs or alcohol during the October 31, 2017 interviews.

{¶ 73} The October 31 interrogations were not appellant's first interaction with the police in this case. Detective Stolz explained that appellant voluntarily came into the police station and spoke with him on two occasions earlier in the week. The October 31 interviews were conducted in the same location, the interview room in the detective's bureau, as the prior interviews. As such, appellant was familiar with the location.

{¶ 74} Throughout the course of the interviews, appellant was fed. Also, on several occasions, appellant was offered water and asked if he needed anything else. Appellant asserted that he had a headache, and he was provided aspirin.

{¶ 75} Detective Stolz testified that appellant arrived at the police station on October 31, 2017, around noon. Thereafter, Detective Stolz interviewed appellant. During this interview, Detective Stolz placed appellant under arrest. After Detective Stolz's interview, Special Agent Fragomeli conducted a pre-polygraph interview, a polygraph examination, and a post-polygraph interview. Appellant confessed to stabbing and shooting the victim during the post-polygraph interview. Detective Stolz testified that after Special Agent Fragomeli's interviews, appellant was returned to his cell at approximately 9:30 p.m.

{¶ 76} Special Agent Fragomeli did not continuously interrogate appellant without taking a break. Several breaks were taken over the course of the day. When appellant requested a break and asserted that he needed more time, the interrogation was suspended.

{¶ 77} Detective Stolz and Special Agent Fragomeli were accommodating to appellant and ensured that he was comfortable during the interrogations. Appellant was not handcuffed during the initial interview with Detective Stolz. At one point, after appellant had been placed under arrest and handcuffed, appellant asserted that the handcuffs were too tight. Officers adjusted the handcuffs and confirmed that appellant was comfortable. Appellant was not handcuffed when he confessed to the murder during Special Agent Fragomeli's post-polygraph interview. Special Agent Fragomeli testified that he never saw appellant in handcuffs.

{¶ 78} At all times during the interrogation, the officers were calm and respectful towards appellant. Appellant was not verbally abused, and the officers did not yell or scream at him. There is no evidence that appellant was physically abused or threatened. Finally, there is no evidence that appellant was subjected to any physical deprivation or mistreatment at any time during the interrogations.

{¶ 79} Finally, a review of the video recordings of the October 31 interviews supports the trial court's findings with respect to the voluntary nature of appellant's *Miranda* waiver and confession. For all of the foregoing reasons, we find that the trial court did not err in concluding that appellant's statements were voluntarily made and not the result of coercion or police misconduct.

{¶ 80} Appellant's first assignment of error is overruled.

### 3. Search of Appellant's Truck

{¶ 81} In his third assignment of error, appellant challenges the trial court's judgment as it pertained to the search of his truck. Specifically, appellant contends

that the police exceeded the scope of his consent and the search warrant authorizing the police to search the truck was invalid.

> The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect against unreasonable searches and seizures and provide that a warrant can be issued only if probable cause for the warrant is supported by an oath or affirmation and particularly describes the place to be searched and the persons or things to be seized. *See also* Crim.R. 41(C); R.C. 2933.23.

> In deciding whether probable cause exists for the issuance of a search warrant, the issuing judge must make "'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, following *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "[C]onsiderations to be taken into account when determining whether to issue a search warrant include how stale the information relied upon is, when the facts relied upon occurred, and whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched." *State v. Castagnola*, 2015-Ohio-1565, ¶ 34, 145 Ohio St.3d 1, 46 N.E.3d 638, citing 2 LaFave, *Search and Seizure*, Section 3.7(a), (b), (d). "'To establish probable cause to search a home, the facts must be sufficient to justify a conclusion that the property that is the subject of the search is probably on the premises to search.'" *State v. Marler*, 2d Dist. Clark No. 2007 CA 8, 2009-Ohio-2423, ¶ 26, quoting *State v. Freeman*, 4th Dist. Highland No. 06CA3, 2006-Ohio-5020, ¶ 13. "The nexus between the items sought and the place to be searched depends upon all of the circumstances of each individual case, including the type of crime and the nature of the evidence." *State v. Carter*, 2d Dist. Greene No. 2011 CA 11, 2011-Ohio-6700, ¶ 10, citing *Freeman* at ¶ 13.

> The duty of the reviewing court is to ensure that the issuing judge had a "substantial basis" for concluding that probable cause existed. *Castagnola* at ¶ 35; *George* at paragraph two of the syllabus. When conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, reviewing courts should accord "great deference" to the issuing judge's determination of probable cause; "doubtful or marginal cases should be resolved in favor of upholding the warrant." *George* at paragraph two of the syllabus. Neither a trial

court nor an appellate court may substitute its judgment for that of the issuing judge by determining de novo whether the affidavit provided sufficient probable cause. *Id.*

*State v. Tutt*, 2015-Ohio-5145, 54 N.E.3d 619, ¶ 36-38 (8th Dist.).

{¶ 82} As an initial matter, this court need not address appellant's arguments pertaining to his consent to search the vehicle and the scope thereof because we find that the police obtained a valid search warrant authorizing them to search the truck in which the knife was recovered.

{¶ 83} The search warrant references the three vehicles that were located within the premises of the victim's residence, and describes the truck as "A red Chevy pickup truck, Ohio license plate CW40SY, VIN 2GCEC19V321418495[.]" The search warrant provided that probable cause existed to believe that evidence was being concealed within the victim's residence and/or the three vehicles, including, specifically, "Knives, bladed instruments[.]"

{¶ 84} With respect to the search warrant that authorized the police to search the truck, this court must determine whether, considering the totality of the circumstances, Officer O'Sullivan's affidavit provided a substantial basis for the issuing judge to conclude there was, in fact, a fair probability that there was evidence related to the murder in appellant's truck.

{¶ 85} The search warrant was issued based on the affidavit of Officer O'Sullivan, a ten-year veteran of the Strongsville Police Department. In his affidavit, Officer O'Sullivan referenced the three vehicles that were parked in the driveway of

the victim's residence upon his arrival, and specifically identified the red truck as one of the vehicles. Officer O'Sullivan averred, in relevant part,

> 3. Affiant avers that officers learned from Southwest General Hospital that [the victim] died later that night. She suffered 35 stab wounds and two gunshot wounds.
>
> * * *
>
> 11. Affiant avers that there were three vehicles parked in the driveway of the residence at the time officers arrived on scene. * * *
>
> 13. Affiant further avers that it is necessary to search the three vehicles located on the premises for all of the same evidence described above,[3] as individuals who commit criminal activity frequently travel to or from the scene of the crime using cars, and leave trace amounts of biological material, weapons, or cellular or electronic devices in their cars after the offense.

{¶ 86} "Statements made in a search warrant affidavit enjoy a presumption of validity. *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945 (1st Dist.). Without evidence to the contrary, this court is bound to find the statements made in the affidavit valid and, thus, the warrants valid." *State v. Mock*, 2018-Ohio-268, 106 N.E.3d 154, ¶ 18 (8th Dist.).

{¶ 87} In determining whether to issue a search warrant, one consideration to be taken into account is "whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 34, citing 2 LaFave, *Search and Seizure*, Section 3.7(a), (b), (d) (5th Ed.2012). As noted above, "[t]he nexus between the items sought and the place to be searched depends upon all of the circumstances of

---

[3] Including, specifically, "[k]ni[v]es, bladed instruments[.]"

each individual case, including the type of crime and the nature of the evidence." *Carter*, 2d Dist. Greene No. 2011 CA 11, 2011-Ohio-6700, at ¶ 10, citing *Freeman*, 4th Dist. Highland No. 06CA3, 2006-Ohio-5020, at ¶ 13.

{¶ 88} Appellant appears to argue that the police did not have any specific information or evidence that the truck was connected to the murder or that any evidence related to the murder was inside the truck. Appellant's argument is misplaced. "The issuing judge need only have concluded that there was a fair probability that contraband or evidence of a crime would be found inside the [place to be searched]." *Tutt*, 2015-Ohio-5145, 54 N.E.3d 619, at ¶ 47, citing *Carter* at ¶ 21.

{¶ 89} After reviewing Officer O'Sullivan's affidavit, and considering the facts set forth therein, we find that probable cause did, in fact, exist to issue the search warrant entitling police to search the residence and the three vehicles in the driveway. Officer O'Sullivan's affidavit provided the issuing judge with a substantial basis for determining that there was a fair probability that evidence related to the murder would be found in the truck.

{¶ 90} The police were actively investigating the murder, and the search warrant was issued after the police learned that the victim sustained gunshot and stab wounds that led them to believe that the perpetrator and the victim knew one another. Officer O'Sullivan testified that the victim's injuries were indicative of a "crime of passion," and as a result, all of the victim's family members were considered as suspects. (Tr. 62.) Sgt. Piorkowski testified that he considered anyone that was at the scene as a suspect.

{¶ 91} Officer O'Sullivan explained during the suppression hearing that it was necessary to search the vehicles because the evidence officers were looking for, including the knife and gun with which the victim was attacked, could have been contained in any one of the vehicles. Officers also believed that any of the vehicles at the scene, including the pickup truck, "could have either brought or removed any evidence from the scene." (Tr. 61.) On redirect examination, Officer O'Sullivan confirmed that the weapons used in the murder were capable of being stored in a truck. At the time he executed the affidavit in support of the search warrant, Officer O'Sullivan learned that appellant had been driving the pickup truck that was in the driveway when he arrived on scene.

{¶ 92} Given the fact that (1) the truck was observed in the driveway of the residence when officers arrived on scene, (2) Officer O'Sullivan initially encountered appellant standing in the driveway when he arrived on scene, (3) officers learned that the victim sustained stab and gunshot wounds (as a result, they were looking for a gun and a knife), and (4) officers suspected that the victim was murdered by someone she knew, we conclude that the trial court could have concluded that there was a sufficient nexus between the truck and the murder and a "fair probability" existed that evidence would be found inside the vehicle.

{¶ 93} After reviewing the record, we find that the trial court properly denied appellant's motion to suppress as it pertained to the search of the pickup truck. The totality of the circumstances set forth in Officer O'Sullivan's affidavit support the issuing judge's probable-cause determination. The officers sufficiently established

the existence of probable cause to search the truck based on the fact that the truck was present at the scene of the crime, the victim was stabbed and shot, and officers reasonably believed that a gun or knife could have been transported, stored, or concealed in the truck, and the officers reasonably believed that the victim was murdered by someone she knew — the truck had been driven by appellant who was engaged to the victim's daughter and residing in the basement of the victim's residence at the time of the murder.

{¶ 94} Finally, as noted above, this court is obligated to accord great deference to the probable-cause determination made by the magistrate or judge who issues the search warrant and resolve any doubtful or marginal case in favor of upholding the search warrant. *George*, 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus.

{¶ 95} Based on the foregoing analysis, we find that the issuing judge had a substantial basis for finding a fair probability that evidence, weapons, and the other items specified in the search warrant would be found in the truck. As such, the trial court did not err in denying appellant's motion to suppress the evidence seized during the search of the truck. Appellant's third assignment of error is overruled.

### 4. Search of Cell Phone and Phone Records

{¶ 96} In his fourth assignment of error, appellant challenges the trial court's judgment as it pertained to the search of his cell phone and cell phone records. Specifically, appellant contends that the search warrants authorizing the police to search the cell phone and phone records were invalid. In his motion to suppress,

appellant argued that the search warrants and affidavits failed to establish probable cause that evidence would be found on the cell phone or in the phone records.

### a. Cell Phone

{¶ 97} Police obtained a search warrant authorizing them to search the cell phones of the victim's husband, the victim, and appellant. The three cell phones were seized at the scene of the murder.

{¶ 98} The search warrant was issued based on the affidavit of Detective Borowske, a 28-year veteran of the Strongsville Police Department. This court must determine whether, considering the totality of the circumstances, Detective Borowske's affidavit provided a substantial basis for the issuing judge to conclude there was, in fact, a fair probability that there was evidence related to the murder on appellant's cell phone.

{¶ 99} In his affidavit, Detective Borowske identified the three phones that were seized. He averred, in relevant part,

> 9. * * * Officer O'Sullivan also obtained a search warrant authorizing him to search the [victim's] residence * * * for, among other things, "[a]ny cell phones, computers, electronic storage or media devices." That warrant was signed by the Honorable Judge Steven E. Gall.
>
> * * *
>
> 11. Affiant further avers that both Bruce Pleskovic and [appellant] voluntarily provided their cell phones to officers at the scene. * * *
>
> 12. Affiant avers, based on his training and experience, that individuals who engage in criminal activity frequently exchange calls or text messages about the crimes before, during, and after the incidents. Affiant avers that it necessary to search the contents of the cell phones recovered from [Bruce, the victim, and appellant] to determine the nature and extent of any communications they may have had regarding

the break-ins, the murder, or anything else relevant to [the victim's] death, for photographs relevant to the investigation, and for GPS data and cell phone tower data.

13. Affiant avers that it is necessary to search the above-described cell phone for any personal communications including but not limited to opened and unopened e-mail messages, instant messages (IM), text messages, letters, and other electronic records, documents, correspondence stored and/or exchanged in electronic form, notes, memoranda, address lists, telephone directories, screen name lists, buddy lists, advertisements, faxes, audio and visual tape recordings, materials or items reflecting or relating in any way to communications or contacts between any individuals.

{¶ 100} After reviewing Detective Borowske's affidavit, and considering the facts set forth therein, we find that probable cause did, in fact, exist to issue the search warrant entitling police to search the cell phones. Detective Borowske's affidavit provided the issuing judge with a substantial basis for determining that there was a fair probability that evidence related to the murder would be found on the cell phones.

{¶ 101} The police were actively investigating the murder, and the search warrant was issued after the police learned that the victim sustained gunshot and stab wounds that led them to believe that the perpetrator and the victim knew one another.

{¶ 102} Officer O'Sullivan acknowledged during the suppression hearing that the police did not have any *specific* evidence that appellant's cell phone was connected to or contained evidence related to the murder. However, he explained that officers believed there was a possibility that the cell phone contained such evidence. (Tr. 71.)

{¶ 103} Detective Borowske explained why it was important to search the cell phones belonging to the victim's husband, the victim, and appellant: "[w]e had to eventually obtain the information from the phones to corroborate testimony or statements that were given to officers." (Tr. 131.) He went on, "[w]e were given information that certain persons that were [at the scene], obviously [the victim], Bruce, and [appellant], were telling us where they were at certain times so we wanted to make sure those stories were true or untrue." (Tr. 132.)

### b. Phone Records

{¶ 104} Police obtained a search warrant to search appellant's T-Mobile/Metro PCS phone records between October 10 and October 23, 2017. The search warrant was issued based on the affidavit of Detective Borowske.

{¶ 105} In his affidavit, Detective Borowske averred, in relevant part,

13. Affiant avers, based on his training and experience, that individuals who engage in criminal activity frequently exchange calls or text messages about the crimes before, during, and after the incidents. Affiant avers that it is necessary to obtain the cell phone records for [appellant's phone] to determine the nature and extent of any communications that [appellant] may have had with anyone about the murder, as well as to determine [appellant's] location, and the identities and contact information of the people with whom he communicated. Affiant therefore avers that it is necessary to obtain the cell phone records for [appellant's] number from T-Mobile.

{¶ 106} After reviewing Detective Borowske's affidavit, and considering the facts set forth therein, we find that probable cause did, in fact, exist to issue the search warrant entitling police to search the phone records. Detective Borowske's affidavit provided the issuing judge with a substantial basis for determining that

there was a fair probability that evidence related to the murder would be found in the phone records.

{¶ 107} Detective Borowske testified during the suppression hearing that it was important to obtain appellant's phone records "[t]o corroborate his statements, his whereabouts, what he had told officers at the scene." (Tr. 138.) Officers wanted to learn (1) whether appellant communicated with anyone about the murder, (2) appellant's location (using GPS coordinates), and (3) the identities of any contacts on the phone that could potentially be witnesses. (Tr. 138-139.) Detective Borowske confirmed that officers believed that this information would be found in appellant's phone records.

{¶ 108} Furthermore,

[t]his court has previously found no privacy right exists for cell phone records maintained by a phone company. [*State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659,] ¶ 47 ("telephone users have no right of privacy in the numerical information they convey to the telephone company. Courts have also held that this reasoning applies to cell phone records obtained from cell phone companies as well."), citing *State v. Neely*, 2d Dist. Montgomery No. 24317, 2012-Ohio-212; *United States v. Dye*, N.D.Ohio No. 1:10CR221, 2011 U.S. Dist. LEXIS 47287 (Apr. 27, 2011). Information that has been voluntarily turned over to third parties does not enjoy protection because a person does not have a legitimate expectation of privacy in such information.

*Mock*, 2018-Ohio-268, 106 N.E.3d 154, at ¶ 23.

{¶ 109} After reviewing the record, we find that the trial court properly denied appellant's motion to suppress as it pertained to the search of his cell phone and phone records. The totality of the circumstances set forth in Detective Borowske's affidavits support the issuing judge's probable-cause determinations.

The officers sufficiently established the existence of probable cause to search the phone and phone records based on the fact that appellant was at the scene of the murder when officers arrived, and the officers reasonably believed that the victim was murdered by someone she knew. Furthermore, the officers sufficiently established that information about appellant's whereabouts on the day of and at the time of the murder would be found on the cell phone and in the cell phone records, and this information could be used to corroborate the statements that appellant made to police.

{¶ 110} Finally, as noted above, this court is obligated to accord great deference to the probable-cause determination made by the magistrate or judge who issues the search warrant and resolve any doubtful or marginal case in favor of upholding the search warrant. *George*, 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus.

{¶ 111} Based on the foregoing analysis, we find that the issuing judge had a substantial basis for finding a fair probability that evidence and other items specified in the search warrants would be found on appellant's cell phone and in his phone records. As such, the trial court did not err in denying appellant's motion to suppress the evidence seized during the search of the cell phone and phone records.

{¶ 112} Appellant's fourth assignment of error is overruled.

## B. Motion to Compel

{¶ 113} In his second assignment of error, appellant argues that the trial court erred in denying his motion to compel the state to provide defense counsel with evidence pertaining to appellant's polygraph examination.

{¶ 114} A trial court enjoys considerable discretion in regulating the exchange of discovery. *State ex rel. Daggett v. Gessaman*, 34 Ohio St.2d 55, 57, 295 N.E.2d 659 (1973). "The granting or overruling of discovery motions in a criminal case rests with the sound discretion of the trial court." *State v. Spates*, 8th Dist. Cuyahoga No. 100933, 2015-Ohio-1014, ¶ 44, citing *State v. Shoop*, 87 Ohio App.3d 462, 469, 622 N.E.2d 665 (3d Dist.1993). A trial court abuses its discretion if its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 115} In his motion to compel, appellant requested the trial court to order the state to produce "any and all documentation, video, audio, data, statements, charts, graphs, data recordings, data captures, or other evidence related to the polygraph[.]"[4] Appellant asserted that the state's failure to disclose the evidence related to the polygraph constituted a violation of appellant's constitutional rights,

---

[4] During oral arguments, appellant's counsel explained that he did not want the state to turn over a video recording of the polygraph examination to use at trial; rather, he wanted the state to turn over charts and/or graphs from the polygraph examination that Special Agent Fragomeli used during the post-polygraph interview.

a violation of *Brady v. Maryland*, 373 U.S. 83, 82 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[5] and a violation of Crim.R. 16(B)(1), (4), and (5).

{¶ 116} Crim.R. 16(B), governing discovery and inspection, provides, in relevant part,

> Upon receipt of a written demand for discovery by the defendant * * * the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment * * * and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:
>
> (1) Any written or recorded statement by the defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant;
>
> * * *
>
> (4) * * * results of physical or mental examinations, experiments or scientific tests;
>
> (5) Any evidence favorable to the defendant and material to guilt or punishment * * *.

{¶ 117} Appellant acknowledged in his motion to compel that the evidence is generally inadmissible at trial. Nevertheless, he maintained that the evidence was still subject to disclosure as a written or recorded statement by the defendant, the result of a scientific test, and evidence that was favorable to the defendant and material to guilt or punishment.

---

[5] In *Brady*, the United States Supreme Court held that pursuant to the Due Process Clause, the state is required to disclose evidence that is both favorable to the defendant and material to either guilt or punishment to the defense.

{¶ 118} In his appellate brief, appellant acknowledges the holdings in *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), and *State v. Davis*, 62 Ohio St.3d 326, 581 N.E.2d 1362 (1991). In *Wood*, the United States Supreme Court concluded that the results of a polygraph examination administered to a state witness were not discoverable under state law or *Brady v. Maryland*. As such, the court determined that the prosecution's failure to turn over the polygraph results did not constitute a discovery violation.

{¶ 119} "In [*Davis*], 62 Ohio St.3d 326, 341, 581 N.E.2d 1362 (1991), the Ohio Supreme Court determined that due to their scientific unreliability, polygraph examination results of prosecution witnesses are not considered exculpatory material discoverable under either Crim.R. 16 nor [*Brady*], 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." *State v. Penque*, 2013-Ohio-4696, 1 N.E.3d 441, ¶ 61 (8th Dist.). The Ohio Supreme Court explained, "[t]his court has never held that a defendant is entitled to the results of polygraph examinations, nor has this court held that polygraph examinations are scientific tests which are discoverable pursuant to Crim.R. 16." *Davis* at 342.

{¶ 120} In the instant matter, appellant argues that *Wood* and *Davis* are distinguishable because they involved polygraphs that had been administered to other third-party individuals, whereas appellant sought evidence related to the polygraph that was administered to himself. After reviewing the record, we disagree and find no merit to this argument.

{¶ 121} The Eleventh District considered a similar argument in *State v. Dykes*, 11th Dist. Lake No. 92-L-078, 1993 Ohio App. LEXIS 6082 (Dec. 17, 1993). In *Dykes*, the defendant-appellant appeared to argue that the state and the trial court "circumvent[ed] the discovery rules and appellant's subpoena power by failing to produce or order the production of clearly discoverable evidence." *Id.* at 42. Appellant filed a discovery request for the production of the results of a polygraph examination that had been administered to a codefendant, and the state did not produce the results during the exchange of discovery. On appeal, in opposing appellant's argument, the state cited *Davis* "for the proposition that polygraph results are not discoverable as scientific tests under Crim.R. 16(B)(1)(d)." *Id.* at 45. In support of his argument, appellant argued that the *Davis* holding "only applied to witnesses who were not defendants or co-defendants." *Id.*

{¶ 122} The Eleventh District rejected appellant's argument, concluding that there is no indication that the *Davis* holding was limited to polygraph examinations administered to third-party witnesses and did not apply to polygraph examinations administered to defendants and codefendants. Furthermore, the court emphasized, "[*u*]*nder no circumstances* are polygraph results discoverable scientific evidence." (Emphasis added.) *Id.*

{¶ 123} In this case, like *Dykes*, appellant argues that the *Davis* holding is inapplicable because he requested evidence related to *his* polygraph examination, not a polygraph examination that was administered to a third-party witness. We disagree, and find no basis upon which to depart from the *Davis* holding.

{¶ 124} The Ohio Supreme Court's holding in *Davis* was based on the subjective and scientific unreliability of polygraph examinations, not the fact that the defendant-appellant sought the results of polygraph examinations administered to three witnesses of the prosecution. The court explained,

> The nature of polygraphs is different from traditional scientific tests. Most, if not all, scientific tests involve objective measurements, such as blood or genetic typing or gunshot residue. In a polygraph test, the bodily response of the examinee to his answers is dependent upon the subjective interpretation thereof by the examiner. Inasmuch as the test is not perceived by the profession to be reasonably reliable, its admissibility is limited in Ohio to situations where the parties stipulate to its admission.

*Davis*, 62 Ohio St.3d at 341, 581 N.E.2d 1362, citing *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978).

{¶ 125} Finally, to the extent that appellant argues that the results of the polygraph examination or answers he gave during the examination were discoverable under Crim.R. 16(B)(1) as a recorded statement by the defendant, we disagree. The Fourth District rejected a similar argument in *State v. Phillips*, 4th Dist. Pickaway Nos. 89-CZ-32 and 89-CA-33, 1992 Ohio App. LEXIS 1016 (Mar. 5, 1992).

{¶ 126} In *Phillips*, the defendants-appellants argued that the trial court erred by failing to order the state to disclose to the defense the questions and answers of a polygraph examination that had been administered to an individual that was purportedly involved in the arson. Alternatively, the defendants argued that the defense was, at a minimum, entitled to an *in camera* inspection of the

summary of the polygraph results. The defendants specifically asserted that the individual's answers to the polygraph questions were statements for purposes of Crim.R. 16. *Id.* at 17. The Fourth District rejected the defendants' argument, concluding that "[t]he concluding summary of a polygraph examiner's interpretation of [the examinee's] answers are not [the examinee's] written, signed, or adopted statement subject to an in camera inspection by the defense." (Emphasis deleted.) *Id.*; *see also State v. Johnson*, 2d Dist. Montgomery No. 14176, 1994 Ohio App. LEXIS 3976, 23 (Sept. 9, 1994) ("[s]tatements of the examinee prior to and following the polygraph test are not discoverable as scientific tests or witness statements").

{¶ 127} Similarly, in this case, Special Agent Fragomeli's summary or interpretation of appellant's answers during the polygraph examination do not constitute a written or recorded statement by appellant. Accordingly, Special Agent Fragomeli's summary and conclusions regarding the polygraph examination are not subject to disclosure under Crim.R. 16(B)(1).

{¶ 128} After reviewing the record, we find no basis upon which to conclude that the trial court abused its discretion in denying appellant's motion to compel. The results of polygraph examinations, regardless of to whom they are administered, are neither admissible at trial, scientifically reliable, nor discoverable under Crim.R. 16. Accordingly, appellant's second assignment of error is overruled.

### III. Conclusion

**{¶ 129}** After thoroughly reviewing the record, we overrule appellant's assignments of error. The trial court did not err in denying appellant's motion to suppress the statements he made to the police or the evidence obtained from the searches of appellant's truck, cell phone, and phone records. Furthermore, the trial court did not err or abuse its discretion in denying appellant's motion to compel.

**{¶ 130}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

FRANK D. CELEBREZZE, JR., JUDGE

SEAN C. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR